583 F.2d 426
 Fed. Sec. L. Rep. P 96,588
AMFAC MORTGAGE CORPORATION, an Oregon Corporation, Plaintiff-Appellant,
v.
ARIZONA MALL OF TEMPE, INC., a Minnesota Corporation,
Watson, Frederick O., and Watson, Jane Doe, his wife,
Ericson, Orrin A., and Ericson, Galoris A., his wife, Watson
Construction Company, a Minnesota Corporation, Commercial
Union Insurance Company, a Massachusetts Corporation, the
Ericson Development Co., a Minnesota Corporation,
Defendants-Appellees.
 No. 76-1495.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 3, 1978.
 
 William S. Hawgood, II (argued), Phoenix, Ariz., for plaintiff-appellant.
 Joseph E. McGarry, Phoenix, Ariz., P. Michael Whipple (argued), Phoenix, Ariz., Frederick J. Martone (argued), of Jennings, Strouss & Salmon, Phoenix, Ariz., David L. White (argued), Phoenix, Ariz., for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before WALLACE and ANDERSON, Circuit Judges, and WILLIAMS,* District Judge.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 This is yet another attempt to convert the securities laws into something which they are not. The securities laws do not afford general relief when commercial loans turn out to have been unwisely made, nor are they a source of general federal jurisdiction. See Great Western Bank & Trust v. Kotz, 532 F.2d 1252, 1253 (9th Cir. 1976). Arizona Mall of Tempe, Inc. (Arizona Mall) defaulted on a building loan agreement with Amfac Mortgage Corporation (Amfac). Amfac brought suit in Arizona state courts on the secured promissory note which had been given by Arizona Mall. Amfac then instituted this action in the federal district court in Arizona, arguing that the promissory note was a "security" within the meaning of the federal and Arizona securities laws.[1] The district court dismissed all of Amfac's securities claims for failure to state claims upon which relief may be granted. The district court also dismissed Amfac's eighth claim for relief which involved a tort against a surety for failure to state a claim upon which relief may be granted.
 
 
 2
 We affirm.
 
 FACTS
 
 3
 This case arises out of the transactions which were undertaken to finance the construction of a shopping center. The principal actors involved in those transactions include the parties to this appeal. Appellant Amfac was the lender who undertook the financing of the project. Appellee Arizona Mall was the owner and borrower from Amfac. Appellee Orrin Ericson was the president of Arizona Mall and also of Appellee Ericson Development Company. Appellee Watson Construction Company (Watson Construction) was the contractor for the construction of the shopping center, and Appellee Frederick O. Watson was the president of that company. Appellee Commercial Union Insurance Company (Commercial Union) was the surety on the construction bond under which Watson Construction was the principal, and Amfac and Arizona Mall were the obligees.
 
 
 4
 On July 11, 1973, Arizona Mall entered into a construction contract with Watson Construction by which Watson obligated itself to construct the shopping center. On that same day, a surety bond was secured from Commercial Union whereby Commercial Union, as surety, bound itself to protect Amfac and Arizona Mall as dual obligees, in the event of default by Watson Construction, the principal.
 
 
 5
 After reviewing the construction contract documents and receiving further assurances from Watson Construction, Amfac formally committed itself to the transaction on August 27, 1973, when the promissory note, deed of trust, and building loan agreement were executed. The promissory note had a face amount of 22.5 million. The entire principal sum under the note was payable by Arizona Mall to Amfac within two years. Arizona Mall could obtain an extension of one year providing it was not in default and upon payment of an additional $225,000.00. Interest on the money actually disbursed under the building loan agreement was to be paid monthly to Amfac. The interest rate was determined monthly at a rate of either 4% Or 51/2% Over the prime interest rate. In the event of default by Arizona Mall under the building loan agreement or deed of trust Amfac could accelerate and demand payment of all sums (both principal and interest) outstanding on the note. To secure payment on the note, Amfac was designated as the beneficiary under a deed of trust to the real property and the shopping center itself as it was completed.
 
 
 6
 Under the building loan agreement, Amfac was to make periodic advances of the principal amount of the promissory note depending upon the degree of completion of the shopping center and whether certain designated lease commitments had been obtained. Amfac's loan was further protected by various other provisions of the building loan agreement. There could be no changes in the plans of specifications which would change the square footage of the project or reduce or increase the contract price by $500.00 or more without the prior written approval of Amfac. The prior approval of Amfac was necessary before anything could be purchased for the shopping center under a conditional sales contract or security agreement. Amfac had the right to inspect both the project and Arizona Mall's books and records. A provision protected Amfac's interest from any lien claims. The events of default were spelled out in some detail.
 
 
 7
 Amfac's interest was additionally secured by other collateral which was pledged by Appellee Ericson and his wife. This included Ericson's interest in the following partnerships: Camelback Center, Conestoga Mall of Grand Island, Northern Center, Park Drive Shopping Center, and Valley West DM. Ericson also pledged 250 shares of the common capital stock of Ericson Development and his wife pledged 225 shares of the common capital stock of Village Ten, Inc. The Ericson appellees also signed a guaranty whereby they obligated themselves to pay all of the obligations of Arizona Mall. Amfac had the power under the guaranty to proceed against the Ericsons and their collateral regardless of what action was taken against Arizona Mall. Additionally, the Ericsons signed a guaranty of completion under which they agreed to assume all responsibility for completion of the project in the case of abandonment by Arizona Mall. Any indebtedness of Arizona Mall to the Ericsons was subordinated to the indebtedness and obligations of Arizona Mall to Amfac.
 
 
 8
 Amfac alleges that the promissory note issued by Arizona Mall was a security, and also that the guaranty, and completion guaranty, were each "securities." Additionally, Amfac claims that all of the documents involved in the transactions taken together were an investment contract and therefore a "security" under the securities laws.
 
 DISMISSAL UNDER RULE 12(b)(6)
 
 9
 The test for determining the sufficiency of the plaintiff's complaint under Rule 12(b)(6), Fed.R.Civ.P., motion for dismissal is:
 
 
 10
 ". . . (A) complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."
 
 
 11
 Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), and Harmsen v. Smith, 542 F.2d 496, 502 (9th Cir. 1976). In this case, the court is aided in its determination by the attachment of several documents to the plaintiff's complaint.[2] The court is not limited by the mere allegations contained in the complaint as Amfac contends. These documents, as part of the complaint, are properly a part of the court's review as to whether plaintiff can prove any set of facts in support of its claim that there were securities involved in the present transaction. On a motion to dismiss, the complaint is construed in favor of the pleader. Sherman v. Yakahi, 549 F.2d 1287, 1290 (9th Cir. 1977). And any doubts are resolved in favor of the pleader. Williams v. Gorton, 529 F.2d 668, 672 (9th Cir. 1976).
 
 
 12
 Amfac argues that dismissal for failure to state a claim was improper in this case in view of Great Western Bank & Trust v. Kotz, 532 F.2d 1252 (9th Cir. 1976). In Great Western, which also presented the question of whether a security was involved, the court held that a dismissal under Rule 12(b)(6) was improper. However, the summary disposition was upheld because the court treated it as a motion for summary judgment. However, Great Western is distinguishable on this point from the present case. In Great Western, the district court considered evidentiary matter beyond the plaintiff's complaint.[3] Unless this evidentiary matter was incorporated in the plaintiff's complaint, it could not usually be considered by the court on a motion to dismiss for failure to state a claim.[4] Therefore, if any state of facts, even those inconsistent with the evidentiary matter presented to the court, could have supported the allegations of plaintiff's complaint, then dismissal was erroneous. However, in the present case this court is not so limited. Since the plaintiff attached to the complaint the several basic documents, the scope of the facts which can support plaintiff's claim is limited by the documents attached to the complaint and involved in this transaction. In the present case, dismissal would be improper only if under any state of facts supporting the allegations of plaintiff's complaint And the attached documents, plaintiff has stated a valid claim.
 
 
 13
 Additionally, Amfac contends that it is improper to decide the issue of whether there is a security on a motion to dismiss for failure to state a claim. However, if the transactions pleaded in plaintiff's complaint do not constitute "securities," then dismissal for failure to state a claim upon which relief can be granted is proper. Hilgeman v. National Insurance Co. of America, 547 F.2d 298, 300 (5th Cir. 1977).[5]THE SECURITY ISSUE
 
 
 14
 The term "security" is defined broadly under both the Securities Act of 1933 and the Securities Exchange Act of 1934. The Exchange Act provides that:
 
 
 15
 ". . . unless the context otherwise requires
 
 
 16
 (10) The term 'security' means any note . . . investment contract . . . or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing . . . ."
 
 
 17
 15 U.S.C. § 78c(a)(10). Even though the definition in the Securities Act of 1933 is slightly different, the two definitions have been held to be virtually identical. Tcherepnin v. Knight, 389 U.S. 332, 335-336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); United California Bank v. THC Financial Corp., 557 F.2d 1351, 1356 (9th Cir. 1977); Great Western Bank & Trust v. Kotz, 532 F.2d 1252, 1255 (9th Cir. 1976). The definition of security under the Arizona securities law (Ariz.Rev.Stat. § 44-1801, et seq.) is also similar and has been held to be virtually identical to the definition under the federal securities law. State v. Brewer, 26 Ariz.App. 408, 549 P.2d 188, 195 (1976); And see Hall v. Security Planning Service, Inc., 371 F.Supp. 7, 14 (D.C.1974). The analysis of whether a security was involved in this transaction is equally applicable to the question as presented under Arizona law and under both of the federal statutes.
 
 
 18
 It has been ultimately left up to the federal courts to determine what financial transactions actually involve "securities" so as to come within the coverage of these statutes. United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 848, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). There is a split between different circuits in the analysis that is utilized in defining "securities"; however, the importance of this is minimal since the results that are reached are generally consistent.[6]
 
 
 19
 Whether the promissory note and other documents given to Amfac constituted "securities" within the meaning of the securities laws must be analyzed under this circuit's "risk capital" test. Under this test the ultimate inquiry is whether Amfac "contributed 'risk capital' subject to the 'entrepreneurial or managerial efforts' of (others)." United California Bank v. THC Financial Corp., 557 F.2d 1351, 1358 (9th Cir. 1977); Great Western Bank & Trust v. Kotz, 532 F.2d 1252, 1257 (9th Cir. 1976). This approach encompasses the economic realities standard and the Howey[7] test which have been utilized by the Supreme Court in United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). United California Bank v. THC Financial Corp., 557 F.2d 1351, 1358 (9th Cir. 1977).
 
 
 20
 Six factors were considered in Great Western And United California Bank to measure the risk involved to the lender. These are not exclusive, nor is any single one dispositive. The factors used were:
 
 
 21
 (1) time,
 
 
 22
 (2) collateralization,
 
 
 23
 (3) form of the obligation,
 
 
 24
 (4) circumstances of issuance,
 
 
 25
 (5) relationship between the amount borrowed and the size of the borrower's business, and
 
 
 26
 (6) the contemplated use of the funds.
 
 
 27
 Even though these factors may be analyzed individually, it is their combined effect which is important. They should not be applied blindly. They must be considered within the context of the securities laws and their purpose. The securities laws were designed to provide for the disclosure of information to those who invested risk capital and to protect them from fraud.[8] With these considerations in mind, we now turn to the ultimate question of whether Amfac contributed capital which was subject to the risk of the entrepreneurial or managerial efforts of Arizona Mall.
 
 
 28
 Two of the Great Western factors may support Amfac's construction of the note as a security: The relationship between the amount borrowed and the size of the borrower's business, and the contemplated use of the proceeds. The risk to the lender increases in proportion to the amount that is borrowed in relation to the size of the borrower's business. The risk to the lender also increases in proportion to the degree to which his funds are necessary to the formation of the enterprise. Since none of the attached documents shed any light on these factors, they will be resolved in favor of Amfac and it will be assumed for purposes of this decision that Amfac could present facts to support its position on these two factors. Nonetheless, this is far from being determinative on the issue since Amfac took several steps to protect itself from any risk which may have been created by these factors.
 
 
 29
 As a general rule, the longer one's money is held by another, the greater the risk of loss becomes for the one contributing the money. Under the terms of the various agreements, Amfac's money was not at risk for a long period of time. The promissory note was due and payable twenty-four months after the date of execution of the note. However, the disbursements by Amfac under the note were dependent upon the progress of construction and the assurances of lease commitments. Only a portion of Amfac's money was actually at risk for the entire twenty-four month period, with the remainder at risk for shorter periods, which were dependent upon the degree to which Amfac's risk was secured by the lease commitments and completion of the construction. Moreover, it was within the exclusive control of Amfac to cease loan disbursements for a variety of reasons, thus giving it the power to reduce the overall risk. In the event of default, Amfac was entitled to accelerate under the agreement and demand immediate payment of principal and interest (which eventually Amfac did). These considerations taken together support our finding that Amfac's money was not at risk with Arizona Mall for any substantial length of time.
 
 
 30
 If a lender is unsecured, then repayment of the loan is more dependent upon the managerial or entrepreneurial efforts of the borrower. If the loan is secured, then the lender is not as dependent since he can always look to the collateral in the event of nonpayment. There is a greater risk created with unsecured loans than with secured loans. Amfac was a secured lender. The loan was secured by the shopping center itself. Amfac's disbursements were timed and conditioned upon the completion of the shopping center and the procurement of lease commitments. Obviously, the intention of Amfac was to have its loan secured to the extent of its disbursements. Additionally, Amfac was secured by the additional collateral put up by the Ericsons and by their guarantees. This certainly made Amfac's loan more secured than the lenders were in either the Great Western or United California Bank cases. In Great Western, the lender was unsecured except for the requirement that the borrower maintain a minimum balance. And the lender in United California Bank only held a security interest in the accounts receivable of the borrower.
 
 
 31
 The form of the obligation supports appellees' position that a commercial loan was involved here and not an investment of risk capital.[9] Throughout the documents attached to plaintiff's complaint, Amfac is referred to as lender and Arizona Mall is referred to as the borrower. There is the promissory note, the building loan agreement, the construction contract, and the guarantees. Nowhere is there any indication that the parties were dealing with securities, or that they believed that the securities laws would govern the transaction.[10] All of the documents taken together lead to the inescapable conclusion that this was a typical construction financing transaction and not the sale of a "security" or "securities."
 
 
 32
 The circumstances surrounding the issuance of the promissory note similarly cannot support a finding that Amfac was placing its money at the risk of the entrepreneurial or managerial efforts of the appellees. Amfac as the lender negotiated the transaction with Arizona Mall and the other appellees. Amfac admits that all relevant information was made available to them. The building loan agreement prohibited any further borrowing by Arizona Mall. Arizona Mall could not and did not offer the promissory note or any other promissory notes to anyone else, and so it was not part of any type of public offering.
 
 
 33
 Amfac argues that 90% Of the promissory note from Arizona Mall was held by other real estate investment trusts. In view of the circumstances surrounding the transaction, this factor is not given too much weight. Interests in the note were not offered to the public at large. Amfac had the opportunity to inspect all of the relevant information surrounding the project prior to entering into it. Amfac was a sophisticated lender. Furthermore, Amfac had the continuing right to inspect the project and the books and records of Arizona Mall at any time. Moreover, the United California Bank decision suggests that the promissory note should be analyzed separately from any participation interests in it.
 
 
 34
 "(W)hile the underlying note may not be a security, the participation interest may fall within the definition of a security. Cf. Avenue State Bank v. Tourtelot, 379 F.Supp. 250, 254 (N.D.Ill.1974)."
 
 
 35
 557 F.2d at 1357, fn. 8. In the present case, the sole lender is bringing an action against the borrowers under the promissory note. Even if Amfac is bringing the action on behalf of those to whom It Sold participation interests, the facts surrounding those separate transactions are not before the court, nor do they need to be to arrive at a decision in the present case.
 
 
 36
 Other factors further dispel the idea that Amfac was placing its money at risk subject to the entrepreneurial or managerial skills of Arizona Mall. Interest on the amount disbursed was to be paid monthly to Amfac. Neither the payment of principal nor interest was conditioned upon the success of the shopping center. The entire principal amount of the promissory note was due and payable twenty-four months after the note was executed. An acceleration clause is not a typical characteristic of a security, nor are specific events of default.
 
 
 37
 The United California Bank decision considered the fact that the notes involved there carried an interest rate 2.75% Over commercial prime as an additional factor indicating that a commercial lending situation was contemplated rather than an investment of risk capital. 557 F.2d at 1358. The promissory note to Amfac carried an interest rate of 4% Or 51/2% Over commercial prime which is also more indicative of a commercial lending situation than an investment of risk capital.
 
 
 38
 The "economic realities" of this transaction all lead to the conclusion that the promissory note given to Amfac was not a security. Amfac was not making an investment of risk capital subject to the managerial or entrepreneurial efforts of Arizona Mall. Amfac was making a construction loan to finance a shopping center. A note given to a lender in the course of a commercial financing transaction is not a security within the meaning of the federal securities laws. If we were to "expand the reach of those acts to ordinary commercial loan transactions," the purpose behind those laws would be distorted. Great Western Bank & Trust v. Kotz, 532 F.2d 1252, 1260 (9th Cir. 1976).
 
 
 39
 After reviewing this transaction as set forth in Amfac's complaint in the light most favorable to it, and resolving any doubts in favor of Amfac, we conclude that the complaint does not state a claim upon which relief could be granted under the securities laws. The district court's dismissal of the second, third, fourth, fifth, sixth and seventh claims of Amfac's complaint is therefore affirmed.
 
 TORT ACTION AGAINST A SURETY
 
 40
 Amfac's eighth claim for relief alleged that Appellee Commercial Union had breached a duty owed to Amfac as an obligee under the construction surety bond. The district court dismissed this claim for failure to state a claim upon which relief may be granted to the extent that the eighth claim stated claims for breach of fiduciary or any implied duty. The district court granted Amfac leave to amend the eighth claim to assert any contract claim against Commercial Union.
 
 
 41
 On appeal, Amfac argues that a surety on a bond owes an implied duty of good faith to the obligee of the bond, and that a breach occurs when the surety fails to settle, thus giving rise to an action in tort.
 
 
 42
 Jurisdiction of this claim is based on diversity of the parties. 28 U.S.C. § 1332(a). Amfac is an Oregon corporation with its principal place of business in California. Commercial Union is a Massachusetts corporation with its principal place of business in Massachusetts. Under the Erie doctrine, the federal court sitting in a diversity action is required to apply state law to questions of substantive law. In this case, the law of Arizona must be examined to determine whether Amfac stated a claim upon which relief could be granted. None of the parties have been able to point to any Arizona law which directly confronts the issue before the court. In this situation a federal court must use its own best judgment in predicting what the Arizona Supreme Court would decide in this case. Tavernier v. Weyerhaeuser Company, 309 F.2d 87 (9th Cir. 1962).
 
 
 43
 In a case involving a surety's duties towards his principal, an Arizona decision imposed the obligation of acting in good faith on the surety. Cushman v. National Surety Corp. of New York, 4 Ariz.App. 24, 417 P.2d 537, 540 (1966). However, the surety's liability was strictly limited by the terms of his contract. Id. This indicates that the Arizona courts would not imply a cause of action in tort for breach of the obligation of good faith by a surety. It would seem that the Arizona courts would follow the general rule that the liability of the surety is limited to the express terms of the surety contract. Id. There does not appear to be any cases, from any jurisdiction, where a court has implied a cause of action giving an obligee a claim in tort when a surety has allegedly breached an obligation of good faith. Even California law, which Amfac finds so persuasive, holds that a surety cannot be held beyond the express terms of the contract. See United States Leasing Corporation v. duPont, 69 Cal.2d 275, 70 Cal.Rptr. 393, 444 P.2d 65, 71 (1968).
 
 
 44
 Amfac relies on Arizona and California case law which it argues gives an insured under a liability insurance contract the right to sue in tort when the insurer has breached its duty of good faith under the contract of insurance. Although this authority may have some persuasive effect, it does not persuade us that the principle should be extended by us to surety contracts.
 
 
 45
 This court, faced with Arizona case law indicating a reluctance to expand a surety's liability, and no case law from any other jurisdiction making a surety liable in tort to an obligee in this situation, will not make such a departure itself. We therefore affirm the district court's dismissal of Amfac's eighth claim for relief insofar as it attempts to state a claim sounding in tort.
 
 
 46
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable David W. Williams, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 Second claim alleged violation of § 10(b) of the Exchange Act and Rule 10(b)5. Third claim alleged violation of § 12(2) and § 17 of the Securities Act. Fourth claim alleged violation of § 44-1991 of the Arizona securities law. Fifth claim alleged violation of § 15 of the Securities Act and § 20 of the Exchange Act. Sixth claim alleged conspiracy to violate the Securities Act and the Exchange Act. Seventh claim alleged further violations of § 12(2) and § 17 of the Securities Act, § 10(b) and Rule 10(b)5 of the Exchange Act, and § 44-1991 of the Arizona securities law
 
 
 [2]
 See Tenopir v. State Farm Mut. Co., 403 F.2d 533 (9th Cir. 1968), where court considered insurance policy attached to the complaint in a motion to dismiss for failure to state a claim
 
 
 [3]
 In the present case, matters outside the pleadings were offered to the district court in the form of an affidavit from appellee Ericson. However, this has no bearing on this motion for two reasons: First, it can be presumed that the district court did not use the affidavit in arriving at its decision to dismiss. The district court must have impliedly excluded the affidavit since it characterized its decision as a motion to dismiss for failure to state a claim rather than as a motion for summary judgment. And, secondly, the affidavit contains little of substance, and nothing which was needed by this court or impliedly by the district court, to arrive at a decision
 
 
 [4]
 Under Fed.R.Civ.P. 12(b), when "matters outside the pleading are presented to and not excluded by the court" the motion to dismiss for failure to state a claim (12(b)(6)) "shall be treated as one for summary judgment."
 
 
 [5]
 On the record made here dismissal in this instance is also proper under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. See the procedural history of United Housing Foundation v. Forman (Forman v. Community Services, Inc.), 366 F.Supp. 117 (S.D.N.Y.1973), 500 F.2d 1246 (2nd Cir. 1974), 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). This defense may be asserted at any time, at either the trial or appellate level, by either the parties or by the court. 5 Wright & Miller, Fed.Prac. & Pr. 545 (1969). Other Circuits have held that dismissal for lack of subject matter jurisdiction was proper in litigation under the securities laws after a determination that promissory notes were not securities. C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc., 508 F.2d 1354 (7th Cir. 1975), Cert. denied, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); McClure v. First National Bank of Lubbock, 497 F.2d 490 (5th Cir. 1974), Cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); Lino v. City Investing Co., 487 F.2d 689 (3rd Cir. 1973); See also McGovern Plaza Joint Venture v. First of Denver Mortgage Investors, 562 F.2d 645 (10th Cir. 1977) (dismissal proper after finding that no security was involved in the transaction; however, the exact basis under Rule 12 is unclear). The record here enabled the district court to properly rule as a matter of law either that no claim for relief could be stated (as it did) or that there was no federal subject matter jurisdiction
 Alternatively, on this record, it could be treated as a motion for summary judgment as was done in Great Western, supra. Nevertheless, we are persuaded that our textual analysis is the correct approach on this record.
 
 
 [6]
 The Ninth Circuit uses a risk capital test in determining whether a transaction is a security. This approach is followed in this decision where we find that the transaction involved did not involve securities under the Federal securities laws. The Second Circuit employed a literal approach in defining security in a recent case. And the Third, Fifth, Seventh, and Tenth Circuits generally follow an "investment-commercial" test
 The literal approach of the Second Circuit was advocated by Judge Friendly in Exchange National Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126 (2d Cir. 1976). Judge Friendly said that all "notes" should be considered securities under the securities laws, unless the note bears "a strong family resemblance" to an enumerated list where the context of the transaction required an exception. Despite the fact that this list focuses on smaller transactions, a note given to finance construction as is involved in the present case, should at least qualify as a relative to Judge Friendly's list of exceptions so that it would not be a security under the securities laws.
 The "investment-commercial" test is premised on the view that the securities laws evinced the concern of Congress about practices associated with investment transactions, and that the securities laws were not designed to regulate commercial transactions. Different characteristics are considered in determining the investment or commercial nature of different notes. See, e. g., McGovern Plaza Joint Venture v. First of Denver, 562 F.2d 645 (10th Cir. 1977); C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc., 508 F.2d 1354 (7th Cir. 1975), Cert. denied, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); McClure v. First National Bank of Lubbock, 497 F.2d 490 (5th Cir. 1974), Cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); Lino v. City Investing Co., 487 F.2d 689 (3rd Cir. 1973).
 A decision applying the investment-commercial test to a factual situation similar to the present case is McGovern Plaza Joint Venture v. First of Denver, 562 F.2d 645 (10th Cir. 1977), where the plaintiff sought financing for the construction of a hotel. The defendants gave a construction loan commitment, and a permanent loan commitment to the plaintiff by which the construction was to be financed. After the defendants failed to carry out their loan commitments, the plaintiff brought an action alleging violation of the securities laws. The district court dismissed the action because the transaction was not a security. The Tenth Circuit affirmed the dismissal after finding that the construction financing was not a security under the commercial investment test. In conclusion, the court said: "(i)n short, there is nothing to indicate that this is anything other than the typical situation where a real estate developer goes into the open market to secure financing for his venture." Id. at 647. This same rationale is equally applicable to the present case.
 
 
 [7]
 S. E. C. v. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)
 
 
 [8]
 In United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975), the Supreme Court stated:
 "The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors."
 
 
 [9]
 In United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Supreme Court held that the name given to an instrument is not dispositive as to whether it is a security, but went on to say that the name may be a factor in deciding whether an instrument is a security for the purpose of applying the federal securities laws. Id. at 850, 95 S.Ct. 2051. The Court said that it may be important because the parties may believe that the transaction is covered by the securities laws when the instruments involved are characterized in the manner whereby the securities laws usually come into play. The form and characterization of the building loan agreement and promissory note in the present case would certainly not give rise to any reasonable expectation by Amfac that the transaction would be covered by the securities laws
 
 
 [10]
 Securities are partially involved in the additional collateral which was pledged by the Ericsons. However, in terms of the whole transaction, this was of minor significance