**UNITED STATES of America, Appellee,**
v.
**Jamie Matlick FARRIS, Appellant.**

**UNITED STATES of America, Appellee,**
v.
**Marcus Theodore BAUMANN, Appellant.**

**UNITED STATES of America, Appellee,**
v.
**Carl Richard TAMUTY, Appellant.**

**Nos. 78–2514, 78–2624 and 78–2905.**

United States Court of Appeals,
Ninth Circuit.

Nov. 26, 1979.

Rehearing Denied March 19, 1980.

---

Joseph R. Keilp, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Joseph B. Swan, Jr., Phoenix, Ariz., for appellant, Farris.

Atmore L. Baggot, Phoenix, for appellant, Baumann.

Barbara L. Caldwell, Phoenix, for appellant, Tamuty.

Before CARTER * and GOODWIN, Circuit Judges, and PECKHAM **, District Judge.

GOODWIN, Circuit Judge:

Jamie Matlick (Kelly) Farris and Marcus Theodore Baumann appeal their convictions on two counts each of securities fraud in violation of 15 U.S.C. § 77q(a). Carl Richard Tamuty appeals his conviction on nine counts of mail fraud in violation of 18 U.S.C. § 1341. We affirm in part, and reverse in part.

## I. FACTS

The appellants were among 23 individuals and firms indicted for securities fraud and mail fraud in connection with a Ponzi scheme which, for a time, produced a substantial cash flow from the interstate sales of real estate mortgage notes and connected instruments in Arizona.

The fountainhead of the scheme was the late William Steuer, founder of Cochise College Park, an investment company. Steuer died before the indictments in these cases were handed down. But the activities he set in motion resulted in criminal prosecutions for his individual and corporate associates.

In 1966 Cochise College Park acquired actual or paper interest in Arizona land, subdivided the land into lots and, during the next few years, sold lots. Each buyer supposedly made a down payment for a lot and signed a promissory note secured by a mortgage on the lot for the remainder of the

---

* Judge Carter participated in the oral argument and decision of this case, but died November 18, 1979, before the opinion was filed.

** The Honorable Robert F. Peckham, Chief Judge, United States District Court for the Northern District of California, sitting by designation.

purchase price. Cochise sold these notes and mortgages to dealers who sold them to the general public through brokers and salesmen.

Cochise sold the notes "with recourse". The investors received a three-part "Guarantee". If a lot buyer defaulted, the investor (if notified of the default) was told that he could choose to seek foreclosure, to accept the substitution of a valid, paying note of equal value, or to demand a cash refund by Cochise of the unpaid principal on the defaulted obligation.

As part of its arrangements with the investors, Cochise agreed to make all collections from the lot purchasers and all disbursements to the investors. Although a large number of putative purchasers in fact defaulted on their notes, Cochise did not inform the investors of defaults. Instead of affording the investors the choice agreed upon in the contracts, Cochise remained silent about the defaults and employed the money from new contracts to maintain, temporarily, the scheduled payments to the early investors at the established rate of return on their contracts. Money generated by down payments and by the sales of new notes provided well-publicized payments to investors. Publicity about these payments in turn attracted new investors and postponed the eventual but preordained financial debacle that resulted in these prosecutions.

When Cochise needed cash, which was virtually all the time, Steuer arranged to have employees create fictitious land-purchase notes by forging a purported lot buyer's name on a contract for a purported lot, or by having someone sign form contracts to purchase even though the signer (usually an employee) did not intend to, and was not expected to, pay off the contract. These fictitious notes were then sold through the sales organization to investors.

Martin Rose, a relative of Steuer, joined Cochise in 1968. In January of 1969, Steuer formed another corporation called Canyon State Properties and installed Rose as president. Canyon State was advertised to lot buyers as the resale agent of Cochise—available to resell the buyers' lots at a future time if the buyers wished to sell. In fact, Canyon State had no assets and conducted no business.

In January of 1970, Rose signed 31 Cochise land purchase contracts in an aggregate face value of approximately $99,000, showing Canyon State as the purchaser. These contracts were sold to investors by means of assignments. Cochise thereafter for a time made the scheduled payments to the investors on these contracts. Cochise received no payment, however, and apparently expected none from Canyon State.

In 1969, Hal Ely joined Cochise as head of its collection department. Ely was placed in charge of collecting payments from delinquent purchasers. In March of 1972, Ely attempted to collect delinquent payments on contracts which, unknown to him, had been forged by Robert Burks, Cochise's vice president in charge of lot sales. Burks told Ely that the contracts had not been signed by the people whose names appeared on them, and directed him to cease his collection efforts on those contracts.

In May of 1970 Richard Curran merged his advertising agency with Cochise and formed a holding company named Inland Capital Corporation. Steuer and Curran each owned 50% of the outstanding stock of Inland Capital.

In January of 1971, Curran and Steuer purchased land purchase contracts (notes) which were then sold to investors to generate a cash flow of approximately $200,000. By this time Cochise had engaged Standard Land Title and Trust Agency to act as collecting and disbursing agent on new contracts. In order to keep Standard from learning that Cochise, and not Curran and Steuer, was actually making the payments on these contracts, Cochise issued its checks to Curran and Steuer who, in turn, issued their personal checks to Standard to cover monthly payments due investors under the assigned contracts.

In 1971 the principals of Cochise engaged the accounting firm of Laventhol, Krekstein, Horwath and Horwath to prepare a

certified audit of Inland Capital. The team found Inland Capital's books wanting in several particulars.

A year earlier, in June or July of 1970, the Securities and Exchange Commission had started to investigate Cochise to determine whether the Cochise "paper" was exempt from registration requirements. In February of 1971, the SEC in Nebraska filed a civil action against Cochise. Thereafter the sales of Cochise paper declined, and in June of 1972 Cochise went into bankruptcy.

Appellants here were tried in the second of two groups. The first trial resulted in the convictions of seven of the participants in the Cochise scheme. Five of these seven appealed their convictions to this court. The convictions of two of the prior appellants were reversed for insufficient evidence that they "knowingly participated" in the scheme. The convictions of the three other appellants were affirmed. *United States v. Hetrick*, No. 77–2798 (9th Cir., Dec. 11, 1978) (unpublished mem.).

The defendants in the second trial were Farris, Baumann, Tamuty, and Marciano A. (Tony) Rivera, Jr. Farris was a dealer whose company, Investors Land Corp., purchased mortgage notes from Cochise and then sold them to Baumann and Baumann's company, Bankers Finance & Holding Co. Bankers Finance then sold these notes to the public, and it did not pay Investors Land until the sales to the public were completed. Farris and Baumann both earned commissions. Rivera and Tamuty were partners in R & T Investment Co., which also sold Cochise mortgage notes to the public. This company and its principals also received substantial commissions.

After the second trial, the jury convicted Farris and Baumann of two counts of securities fraud in violation of 15 U.S.C. § 77q(a), and Rivera and Tamuty of nine counts of mail fraud in violation of 18 U.S.C. § 1341. All four were fined and placed on probation. This appeal, in which Rivera does not join, followed.

## II. INSTRUCTION ON SCIENTER

■ Farris and Tamuty urge that the trial court erred in its instructions to the jury on the requisite mens rea for the crimes of mail fraud and securities fraud. Both object to the judge's charge that the defendants could be held guilty if the alleged fraudulent statements were made "with reckless disregard as to [their] truth or falsity". They cite a number of cases from outside this circuit that contain language disapproving such instructions as confusing to lay jurors (*e. g., United States v. Hanlon*, 548 F.2d 1096 (2d Cir. 1977)). None, however, resulted in reversal. Moreover, the law of this circuit establishes the reckless disregard for truth or falsity is sufficient to sustain a finding of securities fraud or a conviction for mail fraud. *Nelson v. Serwold*, 576 F.2d 1332, 1336–37 (9th Cir. 1978), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978) (securities fraud); *United States v. McDonald*, 576 F.2d 1350, 1358–59 (9th Cir. 1978), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978) (mail fraud). There was no reversible error in the instructions on scienter.

## III. SUFFICIENCY OF THE EVIDENCE

All three appellants argue that there was insufficient evidence to support their convictions. On appeal, this court draws all fair factual inferences in favor of the prevailing party. *E. g., United States v. Kaplan*, 554 F.2d 958, 963 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977).

■ Farris and Baumann were convicted of securities fraud for causing letters to be sent from Baumann's company, Bankers Finance and Holding Co., to two victimized investors, Blanche LaFolette (Benton) and Faith Cochenos. The letters were dated April 12, 1972, and June 21, 1972, respectively. To sustain convictions for these offenses, the government did not need to show that the defendants personally mailed the letters. It is sufficient that the letters were mailed as part of a fraudulent scheme

in which the defendants were active participants. The acts of all active parties to a conspiracy are imputed to each other so long as those acts are reasonably foreseeable steps toward the agreed-upon goal. *See United States v. McDonald, supra; United States v. Outpost Development Co.,* 552 F.2d 868 (9th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 503, 54 L.Ed.2d 450 (1977). Thus, the key question is, At what point did the defendants have sufficient knowledge of the false and misleading representations Cochise made to the public so that the jury could infer that the defendants were active participants in the fraud, intending to deceive investors?

■ In Baumann's case, he had knowledge both of the shaky condition of Cochise and of the misrepresentations being made to investors. He was aware that Cochise was extremely short on cash, that it was selling its notes at a substantial discount, and that it was having difficulties in causing payments to be forwarded to note holders on time. Despite this knowledge, he told both Cochenos and LaFolette that Cochise was a good investment. If he had revealed the truth about Cochise to these purchasers, it is inconceivable that they would have purchased. In sum, the evidence against Baumann was clearly sufficient.

■ There was no direct evidence that Farris personally made misleading representations to the public. There was, however, evidence that his corporation passed along misleading information and circumstantial evidence to establish his knowledge of the facts and of the corporation's activities, which he controlled. Farris knew of the extreme risks inherent in the Cochise enterprise. Cochise was so short of cash at one point that it asked to borrow money from Farris so that it could meet its payroll. Moreover, Farris knew that Baumann's company was reselling the notes after purchasing them from his firm. Farris may or may not have been privy to the discussions between Baumann and the investors that led to the sales of the notes. But Farris admitted he had seen literature used by

Baumann to promote the underlying lot sales. The jury could fairly infer that when commissions began rolling in from sales of these extremely risky notes to the investing public, Farris must have realized that not all material facts about Cochise were being revealed to the buyers. Thus, the jury could properly find beyond a reasonable doubt that Farris willfully participated in the scheme to defraud.

■ Tamuty was convicted of nine counts of mail fraud. The nine counts were all based on "lulling" payments made to investors in Cochise notes. The "lulling" checks were mailed between September 25, 1971, and May 15, 1972. Again, it was not necessary for the prosecution to prove that Tamuty himself mailed the checks, but only that he was a knowing participant in the scheme to defraud at the time the checks were mailed. It was shown that Tamuty and his company sold the notes to nearly all the investors victimized by the charged lulling payments, and that Tamuty was responsible for devising a sales pitch that was effective in producing sales and commissions. He argues, however, that he was never aware of the basic unsoundness of Cochise's financial position until bankruptcy was imminent.

The prosecution makes much of its showing that Rivera, Tamuty's close friend and business partner, was given a copy of Cochise's pessimistic audited financial statement in late 1971. It also stresses that in October 1971 Tamuty found out that Cochise, and not lot buyers, made the payments on some of the notes he had sold. The government argues that these facts prove knowing and willful participation in a fraudulent scheme as of those dates. As Tamuty points out, however, this court has declared that there is no logical relationship between what a defendant could have known and a specific intent to use the mails to defraud. *United States v. McDonald, supra; United States v. Piepgrass,* 425 F.2d 194, 199–200 (9th Cir. 1970). Therefore, the evidence appears insufficient to prove that as of late 1971 he was a knowing and active party to the fraudulent scheme. Admitted-

ly, he engaged in many more transactions than did the exculpated defendants in *Mc-Donald* and *Piepgrass*, and, granted, he was more active in public sales than was Farris; nonetheless, it would be contrary to this court's interpretation of the mail fraud provisions to hold Tamuty responsible for "lulling" payments made before the spring of 1972.

On the other hand, there was sufficient evidence to convict Tamuty on Counts 14 and 16, involving checks mailed to his customers on April 25, 1972, and May 25, 1972, respectively. In March 1972, Tamuty was told by his partner and others that Cochise was in extremely dire financial straits and faced bankruptcy. Burks testified that Rivera and Tamuty confronted Steuer with these facts at a meeting in March, and Steuer confirmed them. Nonetheless, R & T continued to sell cochise notes and mortgages in April and May of 1972 without revealing the material facts to its customers. Thus, there was evidence that, by late March, Tamuty was knowingly participating in the fraudulent scheme. The jury could, therefore, find him responsible for the "lulling" payments of April and May.

In sum, there was sufficient evidence to prove only two counts of mail fraud against Tamuty. The evidence on the other counts against Tamuty was insufficient.

## IV. PREINDICTMENT DELAY

■ Tamuty argues that the indictment should have been dismissed because of delay in returning the charges. The motions to dismiss based on this ground were made before the severance of the case into two trials. A number of codefendants made precisely the same argument in the first appeal involving this scheme. In *Hetrick*, we treated the matter as follows:

"Appellants claim that the Due Process clause of the Fifth Amendment requires dismissal of the indictment because of government-caused preindictment delay. The last acts alleged in the indictment occurred in April of 1972. The indictment was not returned until September of 1976. The appellants assert prejudice (from the deaths of possible witnesses and from the dimming of witnesses' memories).

"In *United States v. Mays*, 549 F.2d 670 (9th Cir. 1977), we held that 'despite the degree of actual prejudice, for a judgment in favor of dismissal, there must be some culpability on the government's part either in the form of intentional misconduct or negligence.' 549 F.2d at 678.

"In the case at bar the trial court said: '* * * [F]rom the stated volume of records in this case and the accounting and title records that weren't available until April of 1975, it seems to me that it would be impossible to institute a valid action any time prior thereto, and subsequently the Government moved with reasonable dispatch from then until the Indictment was returned.'

We agree. The standard of *United States v. Mays, supra,* was satisfied. There was no basis for dismissal." *United States v. Hetrick, supra,* slip op. at 4–5. *See also United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

The defendants here are entitled to their own day in court on this issue, but they have produced nothing to cast doubt on the holding in *Hetrick*. Despite lengthy motion proceedings, including an evidentiary hearing, the defense did not show negligence or intentional misconduct by the prosecution. The trial judge correctly found that the government acted reasonably.

## V. WHAT IS A "SECURITY"?

■ Baumann asserts that the mortgage notes he sold to the public were not "securities" within the meaning of that term as used in the federal antifraud statute. He quotes Professor Loss's remark: "[J]ust as things which look like real estate are securities, some things which look like securities are real estate." *See United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849 n.14, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). According to Baumann, the Cochise

"paper" was merely "a simple note or contract secured by a first mortgage on specific real estate with the title insured by a respectable title insurance company." He contends that no authority has ever held such an interest to be a "security."

In *Brodt v. Bache & Co.*, 595 F.2d 459, 460 (9th Cir. 1978), this court gave the following treatment to the question, What is a security?:

"The term 'security' is defined in Section 2(1) of the 1933 Securities Act, 15 U.S.C. § 77b(1), to mean, *inter alia*, any investment contract. The now-classic definition of an investment contract was formulated by the Supreme Court in *SEC v. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946): 'an investment of money in a common enterprise with profits to come solely from the efforts of others.' The Supreme Court has recently restated that 'the touchstone [of an investment contract] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the enterpreneurial or managerial efforts of others.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975)."

In *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426 (9th Cir. 1978), we held that a $22.5 million promissory note given to finance construction of a shopping center was not a "security". The court characterized as "the ultimate question * * * whether Amfac contributed capital which was subject to the risk of the enterpreneurial or managerial efforts of Arizona Mall." 583 F.2d at 432. We went on to hold that "[a] note given a lender in the course of a commercial financing transaction" was not a security, 583 F.2d at 434, because there was an insufficient tie to the risk of the borrower's entrepreneurial or managerial efforts. The court noted the short term of the note and the security interest in the real estate as factors supporting its conclusion, adding that "Arizona Mall could not and did not offer the promissory note or any other promissory notes to anyone [other than Amfac], and so it was not part of any type of public offering." 583 F.2d at 433. Also significant was Amfac's sophistication as a lender and its continuing right to inspect the borrower's books. *Id.*

In the instant case, as in *Amfac*, the notes were of no especially long term, and there was a security interest in real estate given to the note buyers. But here, unlike in *Amfac*, there was a large offering to many unsophisticated purchasers, including widows, widowers, and the elderly; moreover, there was no access to Cochise's books for anyone but those in a small inner circle of the company. Hence *Amfac* is easily distinguishable.

*United States v. Carman*, 577 F.2d 556 (9th Cir. 1978), is closer to the mark. In *Carman*, this court held that a vocational school sold "securities" when it sold packages of Federally Insured Student Loans to various financial institutions. Even though the federal government guaranteed the loans, we found that the paper carried enough risk tied to the success of the school to render it a "security". The crucial factors were that investors were placed "in a totally passive role" because the school agreed to collect on the notes for them; and that the school charged the full face amount for the notes, even though there was a chance of students' dropping out and demanding reductions in their principal liabilities. 577 F.2d at 563. Because investors could lose on either of these aspects of the contract unless the schools showed "sound management and continued solvency", the loan packages were found to be "securities".

What was said about the loan in *Carman* can be said of the Cochise paper. Cochise not only agreed to act as a collection service on the notes, but it also promised to pay off the principal in cash at the noteholder's option should the lot buyer default. Like the banks in *Carman*, the noteholders have placed substantial trust in the management skill and solvency of Cochise.

Nonetheless, because the SEC had not labeled the contracts "securities" during the

time of the acts in the indictment, Baumann argues that the definition of a "security" was so vague that he could not properly be convicted of securities fraud. He cites the Supreme Court's oft-quoted rule that " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity' ", *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971), and the "basic principle of due process" by which "we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly", *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972).

The Second Circuit has declared that it considers Baumann's position "untenable". *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974) ("investment contract" not void for vagueness "[i]n light of the many Supreme Court decisions defining and applying the term"). Although on the question of constitutionality and vagueness, "[t]he precise point of differentiation in some instances is not easy of statement", *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), we agree with the Second Circuit's position, and we reject Baumann's argument. There are numerous authorities on the definition of a "security", enough to give him, in our opinion, "a reasonable opportunity to know" the bounds of the federal offense.

The rule against vague criminal statutes guards against "trapping the innocent" and delegation of criminological policy decisions to nonlegislative bodies. Neither interest would be vindicated by overturning Baumann's conviction. His involvement in numerous land-fraud schemes is well-documented, and decisions such as *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, *supra*, and *Brodt v. Bache & Co.*, *supra*, adequately limit prosecutorial and judicial discretion in enforcing the statute. It is too late in the day—more than 32 years after the Supreme Court's decision in *SEC v. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)—to say that the term "security" is impermissibly vague. Reasonable people in Baumann's position have every reason to know that, if they commit fraud in selling paper such as Cochise's, they commit a crime.

## VI. SEVERANCE MOTIONS

Farris and Tamuty argue that the trial court erred in failing to sever them from Baumann and Rivera, and from each other. A similar claim was rejected in *United States v. Hetrick, supra*, in which the court quoted *United States v. McDonald*, 576 F.2d at 1355–56:

"Appellants carry the difficult burden of demonstrating undue prejudice resulting from a joint trial, and we will reverse the trial court only in those rare instances where the refusal to sever amounts to an abuse of discretion. *United States v. Companale*, 518 F.2d 352, 359 (9th Cir. 1975), cert. denied sub nom. *Grancich v. United States*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

"The appellants here point only to the slight prejudice resulting from any joint trial and the disparity of proof as to each defendant. They have not demonstrated that the jury could not reasonably have been expected to compartmentalize the evidence as it related to each defendant in light of its volume and limited admissibility. *United States v. Gaines*, 563 F.2d 1352, 1355 (9th Cir. 1977); *United States v. Kaplan*, 554 F.2d 958, 967 (9th Cir. 1977)."

The court in *Hetrick* saw no abuse of discretion in trying jointly the seven defendants in that case, and, similarly, no abuse appears here. Although there is always the possibility of prejudice in a joint trial, that potential was outweighed by the extreme complexity of this case. Had there been 23 separate trials, as the district judge at one point surmised there might ideally be, it would have required 23 separate presentations of the entire fraudulent scheme, to different finders of fact.

This is not a case such as *United States v. Wasson*, 568 F.2d 1214 (5th Cir. 1978), in which a confused jury convicted a party of a charge of which the government conceded he was not guilty. The jury showed it considered the evidence against Farris and Baumann separately and distinctly from that against Rivera and Tamuty. It convicted Farris and Baumann of securities fraud and acquitted them on mail fraud charges, while it did the opposite in the cases of Rivera and Tamuty. Nor were the inconvenience to the defendants and the danger of guilt "rubbing off" as great here as they were in the ·cases cited by Farris and Tamuty. In short, there was no abuse of discretion.

## VII. INSTRUCTION ON DECISION NOT TO TESTIFY

 The trial court instructed the jury not to draw any inferences against Baumann from his failure to testify; the judge told the jury to consider this omission a decision by Baumann that the government did not maintain its burden of proof as to him. Farris and Tamuty argue that this prejudiced them by letting the jury infer that since they decided to testify they must have thought that the prosecution had met the burden as to them.

In joint trials, as this court has noted, the judge is "between the proverbial rock and the hard spot" when asked by one defendant to give a cautionary instruction on the Fifth Amendment right not to testify. *United States v. Epperson*, 485 F.2d 514, 516 (9th Cir. 1973). Nonetheless, it is not error to give such an instruction in that setting. *Id.* Here, the trial court went a small step beyond merely stating that no inference should be drawn; he explained how the jurors should logically construe Baumann's silence. This was no more prejudicial to the defendants than the simpler instruction—especially when, as this court must, one considers the instructions as a whole. *E. g., Stoker v. United States*, 587 F.2d 438, 440 (9th Cir. 1978). *Cf. United States v. Moreno-Nunez*, 595 F.2d 1186 (9th Cir. 1979) (statement by defendant's counsel

that defendant "had the guts to take the stand" and "[w]e know nothing about" non-testifying codefendant; held, no grounds for reversal of codefendant's conviction).

## VIII. CONCLUSION

As to all but Counts 14 and 16, the convictions of Tamuty are reversed. As to Counts 14 and 16 against Tamuty, and the two counts each against Farris and Baumann, the convictions are affirmed.