# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE STATE OF WASHINGTON,

Appellant,

v.

DAVID CORNELIUS CONYERS,

Respondent.

No. 78727-6-I

DIVISION ONE

UNPUBLISHED OPINION

APPELWICK, J. — Conyers appeals six convictions for robbery in the second degree. He makes several arguments. First, the trial court erred in denying his motion to sever the counts. Second, the trial court erred in admitting his ORCA[1] card records because the warrant to seize them was deficient. Third, the prosecutor improperly coached a witness to identify him at trial. Fourth, the trial court erred in allowing the record of when he signed in and out of his work release housing. Fifth, the trial court erred in allowing improper opinion testimony from various witnesses. Sixth, that the cumulative error doctrine entitles him to a new trial. Seventh, a change in the law removing second degree robbery as a "strike" should apply to his sentencing. Eighth, that his life sentence constitutes cruel and unusual punishment. He also argues that the trial court displayed predetermined bias which deprived him of a fair trial and that the trial court improperly allowed testimony of Shae-Anne Mehus and Robert Zarate. We affirm.

---

[1] The ORCA card (One Regional Card for All) is a contactless, stored-value smart card system for public transit in the Puget Sound region of Washington.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

On July 14, 1995, David Conyers was sentenced to life in prison without the possibility of parole. He was sentenced as a persistent offender after being convicted of his sixth count of robbery in the second degree seven days earlier. The Governor conditionally commuted his sentence on December 1, 2015. Conyers was released from prison into work release on December 7, 2016. He was employed at United Recycling in Seattle.

From February to March 2017, a series of robberies were committed in Seattle. The robberies shared several similarities.

On February 6, 2017, a man in construction gear, a hard hat, and dust mask walked into Pike Street Grocery in Capitol Hill. He approached the clerk, who was alone in the store, and demanded all the money in the register. He was adamant but soft spoken and had his hand in the pocket of the hoodie he was wearing under his construction gear. Under the impression that the robber had a gun in his pocket, the clerk gave the robber the money in the register. The robber took the money and walked out.

Seven days later, on February 13, 2017, a man in construction gear, a hard hat, and a mask entered a Bartell Drugstore in Wallingford. He approached the clerk and calmly told her, "I have a gun," and gestured to his belt area. He then said, "I have a gun, don't make a scene, give me the money, give me all the money." The clerk complied, the robber took the money, said, "[T]hank you," and left. There was another employee in the store at the time, but that employee was distracted and did not notice the robbery taking place.

Seven days later, on February 20, 2017, a man in mechanic coveralls and a mask walked into a Rite Aid in Capitol Hill. He approached the lone clerk and very quietly told the clerk he wanted cash and that he had a gun. The clerk complied. The robber took the money, told the clerk not to do anything, and walked out of the store.

Seven days later, on February 27, 2017, a man in a jacket and hard hat walked into a Rite Aid in downtown Seattle. He approached the clerk and quietly said, "[G]ive me your money." The clerk, initially not understanding, said, "[W]hat money?" The robber leaned forward, "popped his eyes" and said again, "Give me the money." The clerk complied. The robber took the money and walked out of the store. The clerk and her manager went out of the store and observed the robber get on a bus at a stop about two doors down from the store.

Two days later, on March 1, 2017, a man in a hard hat and surgical mask walked into a Bartell Drugstore in lower Queen Anne. He approached the lone clerk at the register and quietly said, "[G]ive me the money." Unable to understand what the robber said, the clerk replied, "[W]hat?" The robber quietly repeated his demand. The clerk noticed that the robber had his right hand in his pocket, and later surmised that he may have been attempting to indicate that he had a gun. The clerk gave the robber the money in the register. The robber took the money and walked out of the store.

The next day, March 2, 2017, a man in a hard hat, and a surgical mask entered the DeLaurenti Deli in Pike Place Market. He approached the clerk at the register, indicated that he had a gun, and quietly said, "[G]ive me the money." The

3

clerk initially could not understand the robber and asked him to repeat himself, which the robber did. The clerk asked the robber how much he wanted, and the robber responded that he wanted $100. The clerk responded that he only had $50, so the robber told her to give him that.

As the clerk was counting out the money, another customer approached the counter. The customer observed the clerk appeared to be scared and that his hands were shaking. The customer asked the clerk if he was ok. The clerk did not respond. The robber then said words to the effect of he wanted his change. The clerk handed the robber money from the register. Surmising that a robbery was taking place, the customer reached out and grabbed the money that the clerk had handed to the robber. The robber yanked the money away and left the store. The customer pursued the robber into the market, followed him for some time, until the robber turned around and lunged at him. The customer "back[ed] off" and the robber turned around and headed south down First Avenue.

A camera recorded an image of the robber with his mask pulled down as he exited the DeLaurenti Deli. In an effort to find the culprit, police released this photo to the media to air on local news. Police dubbed the robber the "Bob the Builder Bandit" to generate more attention and increase the likelihood of an identification. An employee at United Recycling in Seattle approached the general manager, Brian Moody, and brought the image to his attention. After viewing the image for himself, Moody contacted the police and informed them that he believed that one of his employees was the Bob the Builder Bandit.

4

Detectives went to United Recycling and spoke to Moody. He confirmed his identification to them, saying he was 98 percent sure that the man in the image was Conyers. Employees at United Recycling are provided with construction gear, hard hats, and dust masks.

Police arrested Conyers at United Recycling that day. During the search incident to his arrest, officers recovered an ORCA transit pass. They obtained his timecards from Conyers's work and determined that he was absent, had clocked in after the time of the robbery for that day, or had not clocked out on the days of the robberies. And, they obtained Conyers's sign in and sign out records from Bishop Lewis House, his work release housing. They also obtained a warrant for transaction records associated with his ORCA card, which Conyers now challenges.

The State charged Conyers with six counts of robbery in the second degree. Conyers moved to sever the counts. The trial court denied that motion. Conyers also moved to suppress the transaction history of his ORCA card. The trial court denied that motion. Conyers moved to suppress evidence of his sign in and sign out records from Bishop Lewis House. The trial court denied that motion.

Conyers was found guilty as charged. The court sentenced him to life in prison pursuant to the Persistent Offender Accountability Act (POAA). RCW 9.94A.570. After his sentencing, the legislature amended the POAA to remove robbery in the second degree from the list of "strike" offenses used to determine if a person is a persistent offender. LAWS OF 2019, ch. 187 § 1(33)(o).

Conyers appeals.

DISCUSSION

Conyers makes several arguments. First, the trial court erred in denying his motion to sever the counts against him. Second, the search warrant for his ORCA card records lacked probable cause. Third, the court erred in admitting evidence related to his work release facility, Bishop Lewis House. Fourth, the prosecutor committed misconduct by coaching a witness. Fifth, the trial court improperly allowed lay witness opinion testimony and counsel was ineffective for failing to object. Sixth, Conyers makes two arguments in a statement of additional grounds (SAG): (a) the trial judge's demonstrated bias against him deprived him of a fair trial, and (b) the trial court erred in allowing testimony of Mehus and Zarate. Seventh the cumulative error doctrine entitles him to a new trial. Eighth, he should be resentenced because the legislature amended the law such that robbery in the second degree no longer constitutes a "strike" for determining whether someone is a persistent offender. Last, he claims his mandatory life sentence constitutes cruel and unusual punishment.

I. Severance

Conyers argues that the trial court erred in denying his motion to sever the six counts against him for trial. Because Conyers did not renew his motion to sever the charges before or at the close of evidence, his claim is waived. CrR 4.4(a)(2). He nonetheless attempts to seek review either through this court's discretion, or by claiming ineffective assistance of counsel.

A. <u>Waiver</u>

A defendant's motion for severance of charges may be made before trial. CrR 4.4(a)(1). If that motion is overruled, they must renew the motion before or at the close of the evidence, or severance is waived. CrR 4.4(a)(2). Conyers concedes that he did not renew his severance motion before or at the close of evidence.

Conyers nevertheless urges us to exercise discretion to reach the merits of the issue.[2] He argues that the issues of joinder and severance were conflated below. Because an objection to joinder need not be renewed in the same way as a motion for severance, it would be preserved for review. See CrR 4.3; <u>State v. Bryant</u>, 89 Wn. App. 857, 864-65, 950 P.2d 1004 (1998).

But, there were no joinder issues in this case. The state brought multiple charges in a single charging document. It did not make a motion to join the charges. In such situations, a motion to sever is the defendant's sole remedy. <u>State v. Bluford</u>, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017). The rule is clear that a motion for severance must be renewed before or at the close of the evidence or it is waived. CrR 4.4(a)(2). Conyers's conflation of the two concepts is without merit.

Conyers next urges the court to exercise its discretion because he characterizes failure to renew the motion to sever as a minor technical error. He argues that the issue was raised pretrial and the State had an opportunity to

_____

[2] RAP 2.5(a) provides that an appellate court may refuse to review any claim of error which was not raised in the trial. However, the rule never operates as an absolute bar to review. <u>State v. Ford</u>, 137 Wn.2d 472, 477, 973 P.2d 452 (1999).

respond. Because nothing happened that would change the analysis, renewal of the motion would serve no purpose and so should not serve as a waiver of the issue. But, CrR 4.4(a)(2) clearly states that party must renew its motion for severance before or at the close of the evidence and does not contain an exception for futility. We decline Conyers's invitation to disregard his waiver of the issue and enforce the rule as written.

B. Ineffective Assistance of Counsel

Conyers next seeks review of his severance claim on the ground that his counsel was ineffective in failing to renew the motion before the close of the evidence.

To establish ineffective assistance of counsel, Conyers must show that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by the performance. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). Counsel is presumed to be effective. Id. It is Conyers burden to show that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We presume, absent a challenge to the sufficiency of the evidence, the judge and jury acted according to law. Id.

As a matter of law—Conyers cannot establish prejudice. In discussing the showing of prejudice necessary to a successful ineffective assistance claim,

Justice O'Connor, writing for the Court, set forth several crucial requirements and limitations.

> Even if a defendant shows that particular errors of counsel were unreasonable . . . the defendant must show that they actually had an adverse effect on the defense.
>
> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.

Strickland, 466 U.S. at 693 (citation omitted).

Accordingly,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
>
> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.

Strickland, 466 U.S. at 694-95.

Finally, Justice O'Connor observed that:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice

suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Strickland, 466 U.S. at 697.

Severance exists to address the danger that a jury might wrongly consider evidence, admitted on one count, to the detriment of the defendant on a different count. On direct appeal from a trial judge's denial of a severance motion, we entertain the possibility that a jury might do so even if it was instructed not to do so. See State v. Bythrow, 114 Wn.2d 713, 721, 790 P.2d 154 (1990) (concern with multiple counts is whether the jury can be "expected to compartmentalize the evidence"); State v. Philips, 108 Wn.2d 627, 641, 741 P.2d 24 (1987) ("[T]he verdicts show that the jury in fact did compartmentalize the evidence."). Indeed, it is the possibility of such "residual prejudice" that is to be balanced against the need for judicial economy in deciding whether a motion to sever is meritorious. State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994).

When the claim is one of ineffective assistance of counsel, however, Strickland establishes a conclusive presumption that the jury followed its instructions and properly applied the law. See 466 U.S. at 694 ("In making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge or jury acted according to law."); 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the

standards that govern the decision."); accord, State v. Grier, 171 Wn.2d 17, 41-44, 246 P.3d 1260 (2011).

Here, the jury was instructed: "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." Instruction 9.

Pursuant to Strickland, the jury is conclusively presumed to have followed this instruction and not used any evidence to convict on a count on which that evidence was not admissible. Thus, Conyers cannot, as a matter of law, establish prejudice from the denial of the motion to sever or from his attorney's waiver of the ability to contest that ruling on appeal.

Because the jury is conclusively presumed to have followed its instructions and properly applied the law, Conyers' ineffective assistance of counsel claim fails.

## II. ORCA Records

Conyers argues that the warrant to seize his ORCA card records was not supported by probable cause. Specifically, he argues that the warrant lacked a nexus between the robberies and his ORCA card records.

A search warrant may be issued only upon a determination of probable cause. State v. Martinez, 2 Wn. App. 2d 55, 68, 408 P.3d 721, review denied, 190 Wn.2d 1028, 421 P.3d 458 (2018). Probable cause requires a nexus between criminal activity and the item to be seized. State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). The decision by a magistrate to issue a warrant is reviewed for abuse of discretion. State v. Vickers, 148 Wn.2d 91, 108, 59 P.3d 58 (2002). However, we review the trial court's determination that the warrant was supported

by probable cause de novo.  Martinez, 2 Wn. App. 2d at 66.  We review search warrants in a common sense, practical manner, rather than in a hyper technical sense.  State v. Stenson, 132 Wn.2d 668, 692, 940 P.2d 1239 (1997).  Doubts as to the existence of probable cause are generally resolved in favor of issuing the search warrant.  Vickers, 148 Wn.2d at 108-09.

The affidavit for search warrant indicates that Conyers's ORCA card was found on his person during the search incident to his arrest.  It also recounted the facts of each robbery including their time and location.  The affidavit indicates that the affiant compared Conyers's driver's license photo with a surveillance photo of the robber's face and found a "compelling likeness."  It also indicates that Conyers's manager at United Recycling identified the suspect in the surveillance photo.  The affidavit requested ORCA card records only for the date range of the robberies.

The affidavit does not proffer evidence that the suspect used public transit in the commission of the robberies.  However, the affidavit outlined sufficient evidence to establish probable cause to believe that Conyers committed at least the DeLaurenti robbery.  The affidavit included the affiant's own conclusion that there was a "compelling likeness" between the man in the DeLaurenti photo and Conyers.  It also included that Conyers's manager had identified him as the man in the DeLaurenti photo as well.  The affidavit included similarities between the robberies, including the use of construction gear and similar demeanor in all robberies that created a strong inference that he committed the others as well.  That the ORCA card was found on Conyers's person during the search incident to

his arrest creates a commonsense presumption that he uses the card for transportation because ORCA cards must be purchased and they serve no other purpose. That Conyers purposefully acquired the card and carried it indicates his use and reliance on the card for transportation. The affidavit indicates that all the robberies occurred in the city of Seattle and therefore they were accessible by Seattle public transit. Common sense holds that it is reasonably likely that evidence pertaining to the robberies, i.e., whether Conyers had used public transit to get to the vicinity of those robberies at the time they occurred, would be found in his ORCA card records.

Conyers seeks to compare this case to State v. Jackson, 150 Wn.2d 251, 76 P.3d 217 (2003). He claims the facts are similar in that police in that case also sought to track a defendant's movements. In that case, police investigating the disappearance of Jackson's daughter obtained warrants authorizing the installation and use of global positioning system devices on his vehicles. Id. at 257. Police theorized that Jackson had hastily buried his daughter's body or would have some other reason to return to the location of her body. Id. at 221. Our Supreme Court upheld the warrant because a thorough search of the area around the defendant's house had turned up no sign of the daughter, so it was reasonable to infer that Jackson had used a vehicle to transport his daughter to another location. Id. at 265. It was therefore a reasonable inference that Jackson might use a vehicle to return to her location, either because she was still alive, or because there was limited time to bury her such that he would need to return to the gravesite. Id. at 266-67.

13

Conyers claims these facts are much more specific than the "bald request to track location" present in his case. But, the fact that the Jackson warrant application had more specificity, does not address whether the warrant application here had too little specificity.

We find the warrant for Conyers's ORCA card records was supported by probable cause.

III. Bishop Lewis House

Conyers objects to the trial court's admission of evidence of the logbook and facility rules of Bishop Lewis House. He claims the evidence was unfairly prejudicial under ER 403 and 404(b). Specifically, he is concerned that the jury would infer Conyers's criminal history because he was staying at Bishop Lewis House. We review decisions on the admissibility of evidence for abuse of discretion. State v. Giles, 196 Wn. App. 745, 756, 385 P.3d 204 (2016).

Only relevant evidence is admissible at trial. ER 402. Evidence is relevant if it is probative of a material fact. Giles, 196 Wn. App at 757. A fact is material if it is of consequence in the context of other facts and the applicable standard of law. Id. It is probative if it tends to prove or disprove a fact. Id. ER 403 allows that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. And, ER 404(b) prohibits the introduction of character evidence to prove the defendant acted in conformity therewith.

Here, Bishop Lewis House maintained a logbook in which residents were required to sign in and out as they left or arrived at the facility. The trial court found

14

this evidence highly probative because it provided circumstantial evidence of Conyers's location during the robberies. The trial court nevertheless recognized the prejudicial nature of Bishop Lewis House being a work release facility supervised by the Department of Corrections (DOC). The court therefore excluded all references to the DOC or Bishop Lewis House as a work release facility, because then the jury could think the facility was a treatment facility, low income housing project, or shelter. Conyers argues this was insufficient, because any reference to the fact that residents were not allowed to leave without signing out would imply they were being closely monitored. He further argues that the evidence was minimally probative because the same information was available by simply introducing Conyers's timesheets from work.

Contrary to Conyers's argument, the evidence is highly probative circumstantial evidence of his location during the robberies. The value of this circumstantial evidence comes from the State's ability to combine it with other circumstantial evidence, like Conyers's timesheets from work. These two pieces of evidence are not interchangeable without the assumption that when Conyers is not at work, he is at Bishop Lewis. This is, of course, not what the State is seeking to prove. The State seeks to prove that Conyers was not at work or Bishop Lewis House, and therefore could have been the person who committed the robberies. This requires both the Bishop Lewis logbook and Conyers's work timesheets. And, while there is some danger of unfair prejudice, that danger must substantially outweigh the probative value of the evidence. ER 403. Here, the trial court endeavored to sanitize the record by removing references to DOC or Bishop Lewis

15

House as a work release facility. This minimized the risk of unfair prejudice to the point that it did not substantially outweigh the significant probative value of the evidence. Its decision to admit the evidence with conditions to minimize the risk that the jury would infer Conyers's criminal history was not manifestly unreasonable.

The trial court did not abuse its discretion in admitting information relating to Bishop Lewis House.

IV. Witness Coaching

Conyers claims the prosecutor impermissibly coached a witness to identify him during trial. He did not object to this alleged impropriety at trial. He nevertheless seeks review because the prosecutor's conduct was so flagrant and ill-intentioned that no curative instruction could have erased the prejudice. In the alternative, he suggests trial counsel was ineffective for failing to object. Because we find that the prosecutor did not act improperly, we reject both arguments.

Counsel is not prohibited from consulting with his or her witness during trial. See State v. Delarosa-Flores, 59 Wn. App. 514, 516, 799 P.2d 736 (1990). However, the State is not permitted to urge a witness to create testimony. State v. McCreven, 170 Wn. App. 444, 475, 284 P.3d 793 (2012). Generally, the party alleging prosecutorial misconduct bears the burden of showing the challenged conduct was improper. See State v. Emery, 174 Wn.2d 741, 759, 278 P.3d 653 (2012).

Here, Conyers's manager, Brian Moody, was initially unable to identify Conyers in the courtroom. After speaking to Moody at a later recess, counsel elicited the following testimony:

Q     Before the jury came out, you were looking at this individual dressed in the suit here (indicating) with the pattern tie, right?

A     Yes.

Q     And then you also, when I was sitting over at counsel table, then you looked at me, right? Is that a yes?

A     Yes.

      MR. CONROY: That's leading as well.

      THE COURT: It's foundation, counsel.

Q     (BY MR. GAUEN) And then did I come up and talk to you right here?

A     Yes.

Q     And did I ask you if you recognized anybody?

      MR. CONROY: Now, now, we're well beyond foundation. That is leading.

      THE COURT: It's leading. Ask it in a nonleading fashion.

Q     (BY MR. GAUEN) What did I talk to you about?

A     You asked me if I recognized Mr. Conyers now.

Q     And what did you say?

A     I said yes.

Conyers claims the testimony above shows that the prosecutor improperly coached Moody during the recess. The State argues that the prosecutor merely clarified Moody's nonverbal cues during recess that he had recognized Conyers by asking if he "recognized Conyers now."

17

Conyers has not met his burden to establish that the prosecutor's conduct was improper. He seeks to differentiate this interaction from Delarosa-Flores, 59 Wn. App.at 516, where counsel utilized a recess to refresh a witness's memory with a prior statement. This is different, he says, because counsel's interaction here was a "purposeful interaction" that "coaxed Moody into responding affirmatively." Refreshing a witness's recollection is also a "purposeful interaction" that encourages a witness to alter testimony. The only difference is that a refreshed witness is given stimuli in the form of prior statements to influence their testimony, then asked if their recollection is refreshed. ER 612. Here, counsel skipped step one and proceeded right to step two. That is, he asked the witness if his recollection was refreshed without giving him any stimuli to influence that recollection. If it is proper to ask a witness if they are refreshed after showing them a previous statement, it is certainly proper to ask if their recollection is refreshed without seeking to influence their testimony at all.

We find that the prosecutor did not act improperly.

V. Opinion Testimony

Conyers argues that the trial court erred in allowing improper opinion evidence that invaded the province of the jury. Specifically, he claims that detectives' opinions on the similarity of Conyers's appearance and clothing to images from the robbery was improper because these detectives were in no better position than the jury to determine such similarities. Trial counsel objected only once on the basis of improper opinion testimony, which was overruled. Conyers seeks review of the instances where he did not object on the theory that counsel

18

was ineffective for failing to do so. We review the trial court's evidentiary rulings for abuse of discretion. Stenson, 132 Wn.2d at 701. These decisions will not be reversed unless manifestly unreasonable. Id.

A lay witness may give opinion testimony when it is (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of his testimony or the determination of a fact at issue. State v. Hardy, 76 Wn. App. 188, 190, 884 P.2d 8 (1994). A lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury. Id.

Here, the trial court ruled that it would allow testimony concerning similarities between Conyers and clothing in his possession and the images from surveillance. However, it would not allow testimony that they were the same. The State contends the former is helpful to the jury because it helped to focus its attention on perceived similarities. This was helpful because of the sheer volume of the evidence that the jury was being asked to consider. Conyers counters that this is not helpful to the jury because the detectives were in no better position to assess similarities than the jury.

The trial court's distinction between similarities and an ultimate conclusion of identity is not manifestly unreasonable. The trial court did not allow the detectives to testify as to the ultimate conclusion of the identity of the person in the photographs, instead leaving that determination to the jury. It cannot be said that

19

directing the jury's attention to the similarities that the witness identified was not helpful to the jury's own determination of identity.

The trial court's decision is therefore not manifestly unreasonable and not an abuse of discretion.

In order to succeed on an ineffective assistance of counsel claim, Conyers must show deficient performance by his counsel and that there is a reasonable probability that the result of the proceeding would have been different but for that performance. Sutherby, 165 Wn.2d at 883; Strickland, 466 U.S. at 694. The trial court outlined its reasoning on this issue when Conyers objected to testimony about similarities. We have no reason to believe that the trial court would have ruled differently had Conyers repeated this objection to later instances of testimony about similarities. Conyers does not demonstrate that the result of the proceeding would have been different. The initial objection preserved the issue for appeal.

We reject Conyers's claim for ineffective assistance of counsel.

## VI. Statement of Additional Grounds

Conyers makes two arguments in a SAG: that the judge was biased against him, and that the trail court improperly allowed testimony of Mehus and Zarate.

### A. Judicial Bias

Conyers claims the judge declared a predetermined bias against him in the proceeding. The appearance of fairness requires that a judge must appear to be impartial. State v. Post, 118 Wn.2d 596, 618, 826 P.2d 172, 837 P.2d 599 (1992). However, a party seeking to invoke the doctrine must show evidence of actual or potential bias. See Id. at 619. Pursuant to the doctrine, a judicial proceeding is

valid if a reasonably prudent, disinterested observer would conclude that the parties received a fair, neutral, and impartial hearing. State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d 703 (2017)

Conyers points to the following comments by the judge: "Mr. Conyers was observed wearing construction clothing, particularly a dark colored backpack. And in five of the six robberies, he was wearing an orange hard hat. And in all the robberies, he was wearing a surgical mask." He further takes issue with the comment, "And also the, essentially the behavior of Mr. Conyers. He was very, very polite during these robberies." These comments by the judge occurred during her oral ruling on Conyers's motion to sever and not in the presence of the jury.

Conyers appears to argue that these comments indicate that the trial judge had predetermined that he was the perpetrator of the robberies and therefore was biased against him. He cites no case where the use of a defendant's name to refer to the perpetrator of the charged crime was considered evidence of bias. He points to no other evidence that the judge possessed any bias. A reasonable observer would conclude that the judge committed a minor error in language while comparing the facts of each charge and was not biased against Conyers.

We therefore reject Conyers judicial bias claim.

B. Testimony of Mehus and Zarate

Conyers claims that the trial court erred in allowing prejudicial testimony of Department of Corrections Officers Mehus and Zarate. He points to the fact that the State originally stated it would have very few questions for them, but later asked over 80 questions. He says many of the questions were "unfairly prejudicial." He

21

does not say how they are prejudicial. We review the trial court's evidentiary rulings for abuse of discretion. Stenson, 132 Wn.2d at 701.

The dispute about these officers' testimony at trial surrounded their status as DOC employees. The trial court addressed this issue by prohibiting any reference to their employment at DOC and by having them referred to as "case managers" rather than corrections officers. Similar to the sanitization of the record related to Bishop Lewis House, this decision was not manifestly unreasonable and therefore was within the trial court's discretion. Conyers cites no case where allowing a witness to answer more questions than the State originally anticipated asking is prejudicial.

We therefore reject Conyers's claim that Mehus and Zarate should not have been allowed to testify.

## VII. Cumulative Error

Conyers claims that the cumulative error violated his due process right to a fair trial. A defendant may be entitled to a new trial when errors, even though individually not reversible error, cumulatively produce an unfair trial. See State v. Coe 101 Wn.2d 772, 789, 684 P.2d 668 (1984). Because we find no errors, the doctrine is inapplicable here. We therefore reject Conyers's cumulative error claim.

## VIII. Statutory Sentencing Amendments

Conyers claims he is entitled to resentencing because the legislature removed robbery in the second degree from the list of "strike" offenses after he was sentenced. Conyers was sentenced to life in prison pursuant to the POAA.

22

The POAA mandates a life sentence without the possibility of parole for persistent offenders. RCW 9.94A.570. A persistent offender is a person convicted of a most serious offense for the third time. RCW 9.94A.030(38). Most serious offenses are identified in RCW 9.9A.030(33). At the time of his conviction, robbery in the second degree was considered a most serious offense. Former RCW 9.94A.030(33)(o) (LAWS OF 2018, ch. 166 § 3). However, the legislature has removed it from the list of most serious offenses, effective July 28, 2019. RCW 9.94A.030(33) (LAWS OF 2019, ch. 187 § 1). Conyers' prior adult criminal history at the time of sentencing consisted of six convictions for robbery in the second degree. Conyers argues either that the change in the law should be applied prospectively because his case is on appeal, or in the alternative, that the law should be applied retroactively to his case.

Since this case was heard, these arguments have been rejected in two cases in our court. State v. Molia, ___ Wn. App. 2d ___, 460 P.2d 1086, 1090 (2020); State v. Jenks, 12 Wn. App. 2d 588, 595,-597, 459 P.2d 389 (2020). We follow those cases and reject Conyers's argument.

IX. Cruel and Unusual Punishment

Conyers argues that his mandatory life sentence constitutes cruel and unusual punishment. He argues both that his sentence is grossly disproportionate to his crime and it does not allow a sentencing court to take youthfulness into account.

A. Proportionality

Conyers argues that a mandatory life sentence is grossly disproportionate to his crime. He focuses his analysis on whether his sentence runs afoul of article I, section 14 of the Washington Constitution, because that provision is more protective than the Eighth Amendment to the United States Constitution in this context. State v. Witherspoon, 180 Wn.2d 875, 887, 329 P.3d 888 (2014).

Article I, section 14 of the Washington Constitution protects against sentences that are grossly disproportionate to the crime committed. State v. Gimarelli, 105 Wn. App. 370, 380, 20 P.3d 430 (2001). To determine whether a punishment is grossly disproportionate, courts utilize four factors: (1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction. State v. Fain, 94 Wn.2d 387, 397, 617 P.2d 720 (1980).

Our Supreme Court has repeatedly found, after weighing the relevant factors, that a life sentence for robbery in the second degree for persistent offenders is not grossly disproportionate under Article I, section 14. Witherspoon, 180 Wn.2d at 889; State v. Manussier, 129 Wn.2d 652, 677, 921 P.2d 473 (1996). The Witherspoon court found that factors (1), (2), and (4) supported a finding that a life sentence in this context was not disproportionate, but that factor (3) supported a disproportionality finding because only three other jurisdictions impose a similar sentence. See, 180 Wn.2d at 888-89. Conyers does not challenge the Witherspoon court's analysis as to factor (1). However, he claims

24

that factors (2) and (4) must be reexamined because the legislature has removed robbery in the second degree from the list of most serious offenses.

Factor (2) asks the court to consider the legislative purpose behind the sentencing statute. Witherspoon, 180 Wn.2d at 888. The Witherspoon court found this factor weighed against a finding of disproportionality. See id. It identified the purpose of the POAA as to deter crime and to segregate those who continually commit serious offenses from the rest of society. Id. Conyers argues this purpose is no longer applicable to Conyers's sentence because the legislature no longer considers robbery in the second degree to be a "most serious offense." Conyers's argument is misguided. The legislative purpose at the time he was sentenced did not change because the legislature later amended the statute. That purpose, to segregate persistent offenders from the rest of society, was upheld as legitimate in Witherspoon 180 Wn.2d at 888. The legislature did not express any intent to have previous sentences revisited when it changed the law, nor did it make any findings that its purposes had not been served while robbery in the second degree was considered a "most serious offense." LAWS OF 2019, ch. 187 § 1. That the legislature later decided to address robbery in the second degree in a different way does not make its purposes while the crime was considered a "most serious offense" any less legitimate.

Factor (4) askes the court to consider the punishments for other offenses in the same jurisdiction. Witherspoon, 180 Wn.2d at 888. The Witherspoon court found this factor did not support a finding of disproportionality because the repetition of criminal conduct aggravates the guilt of the last conviction and justifies

25

a heavier penalty for the crime. Id. at 889. It pointed out that all persistent offenders are sentenced equally under the statute. Id. Conyers argues that this factor must be reexamined because the legislature removed robbery in the second degree from the list of most serious offenses. Again, his argument is misguided. That the legislature later decided to remove robbery in the second degree from the list of most serious offenses does not change the fact that, at the time of his conviction, the sentences given out for persistent offenders were consistent.

That the legislature chooses to move in a different direction does not necessitate a reexamination as to our previous findings on the legitimacy of legislative intent. Our Supreme Court's holding in Witherspoon is not any less applicable to Conyers's sentence because the legislature has since changed the law.

We reject Conyers's claim that his sentence is grossly disproportionate to his crime.

### B. Youthfulness

Conyers argues that his sentence is cruel and unusual because it does not allow for youthfulness at the time of his offenses to be considered. Conyers is 46 years old. At the time of the robberies, he was 42 years old. He nevertheless argues that youthfulness should be considered here, because his earlier convictions for robbery, which form the basis for his classification as a persistent offender, occurred when he was between the ages of 18 and 20.

In making his arguments, Conyers cites to extensive case law that gives Washington courts discretion to consider youthfulness when sentencing a juveniles. Conyers is, of course, not a juvenile. He nevertheless argues that his sentence must take his former youthfulness into account because he was not sentenced "for his last strike conviction," which occurred when he was 42, but instead that his "sentence rested equally on all the strike convictions." Thus, he argues, his life sentence is as much a punishment for his previous strike offenses at ages 18 through 20 as it was for his current strike conviction.

Since Conyers made his argument, our Supreme Court has ruled on this issue. See State v. Moretti, 193 Wn.2d 809, 814, 446 P.3d 609 (2019). It determined that that there is no constitutional prohibition against sentencing an adult to life in prison under the POAA even when one of their prior strikes occurred in their youth. Id. We see no reason why this logic would not apply to situations where the defendant committed two prior strikes in their youth.

In any case, Conyers's argument that his sentence rests equally on all his convictions is misguided. Life sentences under the POAA are "not cumulative punishments for prior crimes." Witherspoon, 180 Wn.2d at 888-89. The repetition of criminal conduct aggravates the guilt of the last conviction and justifies a heavier penalty for the crime." Id. at 889. Thus, Conyers's sentence is not for his previous crimes, where his relative youthfulness may have been a consideration, but for his most recent crimes, that he committed when he was 42 years old.

We therefore reject Conyers's claim that his youthfulness at the time of his first strike offenses renders his current punishment cruel and unusual.

We affirm.

Appelwick, J.

WE CONCUR:

Andrus, A.C.J.

Dwyer, J.