[Nos. 53210-9, 53333-4, 53336-9.   En Banc.   August 6, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERTA PHILIPS, ET AL, *Petitioners.*

THE STATE OF WASHINGTON, *Respondent,* v. EUGENE R. MONTGOMERY, *Petitioner.*

*In the Matter of the Personal Restraint of* EUGENE MONTGOMERY, *Petitioner.*

628

*Elizabeth K. Selleck,* for petitioner Philips.

*E. Gary Donion,* for petitioner Smith.

*William H. Fligeltaub,* for petitioner Thompson.

*Paul J. Bernstein,* for petitioner Montgomery.

*Norm Maleng, Prosecuting Attorney,* and *Greg Montgomery, Deputy,* for respondent.

*Kenneth O. Eikenberry, Attorney General,* and *Jeffrey O. C. Lane, Senior Assistant,* amici curiae for respondent.

DORE, J.—Petitioners were convicted of several counts of securities fraud—RCW 21.20.010. They argue that the promissory notes that they marketed to investors were not securities; that their cases should have been severed; and that their individual convictions were not supported by substantial evidence. We affirm.

## FACTS

Sea–Tac Mortgage, Inc. was founded in August 1981, with a principal business of brokering institutional and private loans. The brokerage of private loans involved matching borrowers who applied for loans with investors who funded those loans. The loans were typically high risks and the borrowers were typically unable to obtain loans elsewhere because of lack of steady employment or a strong credit history. The borrowers signed documents provided by Sea–Tac stating that the loans were for business purposes; however, all the loans at issue in this case were for nonbusiness purposes, such as making mortgage payments, or paying overdue personal bills. The borrowers apparently were unaware that a 30 percent interest rate for a nonbusiness loan is usurious in this state.

Sea–Tac advertised in newspapers and on television offering investments with a 30 percent rate of return. The potential investors were told that all the private loans brokered by Sea–Tac were for business purposes. Sea–Tac allowed investors to choose loans to fund after showing them credit documents and appraisals of the borrowers' property. In all the transactions leading to convictions, Sea–Tac failed to inform investors of the risky nature of the loans or that they were not in fact for business purposes, making the 30 percent interest rate illegal.

Sea–Tac performed various services for investors: it screened borrowers; prepared the paper work; had credit checks and property appraisals done on borrowers; obtained borrowers' signatures on documents stating the loans were for business purposes; often guaranteed investments or had investments refinanced; and offered to collect

bad loans for investors for an extra fee. Investors made their checks payable to Sea–Tac, and Sea–Tac retained fees of up to 50 percent of the loan amount before issuing checks to the borrowers. The borrowers signed promissory notes secured by deeds of trust on their property payable to the individual investors that financed their loans.

The Washington State Securities Division ordered Sea–Tac to cease operations in February 1982. By that time the loans had started to go bad, and Sea–Tac was unable to cover them.

Defendants Gordon Thompson and Eugene Montgomery, principals and officers of Sea–Tac, and defendants William Smith and Roberta Philips, employees of Sea–Tac, were charged with securities fraud and theft in a 16–count information. After a 3–week trial, a jury found the defendants guilty of various counts of securities fraud under RCW 21.20.010. The Court of Appeals affirmed the convictions. *State v. Philips*, 45 Wn. App. 321, 725 P.2d 627 (1986). We granted the petitions for discretionary review and consolidated them with petitioner Montgomery's personal restraint petition.

### SECURITIES UNDER RCW 21.20

The threshold issue is whether the promissory notes that Sea–Tac marketed to investors were "securities" under RCW 21.20.010. The term "security" is defined in RCW 21.20.005, which states in pertinent part:

> The definitions set forth in this section shall apply throughout this chapter, unless the context otherwise requires:
>
> . . .
>
> (12) "Security" means any note; . . . evidence of indebtedness; . . . investment contract . . .

That definition mirrors the definitions of the federal Securities Act of 1933, 15 U.S.C. §§ 77a, 77b *et seq.* and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq. Sauve v. K.C., Inc.,* 91 Wn.2d 698, 700, 591 P.2d 1207 (1979). We therefore look to federal law to determine the meaning of the term "security". *McClellan v. Sundholm,* 89

Wn.2d 527, 531, 574 P.2d 371 (1978); *see also* RCW 21.20-.900 (policy of the Securities Act of Washington is to make uniform the law and to coordinate its interpretation and administration with related federal regulation).

■ Petitioners first allege that the court erroneously submitted to the jury the issue of whether the notes marketed by Sea–Tac were securities. Federal criminal securities fraud cases in which there are disputed facts have held that it is proper to submit the issue of whether an instrument is a security to the jury. *United States v. Carman,* 577 F.2d 556, 562–63 (9th Cir. 1978); *United States v. Austin,* 462 F.2d 724, 736–37 (10th Cir.), *cert. denied,* 409 U.S. 1048 (1972). Here, the underlying facts that determined whether the notes were securities were disputed. Under those circumstances, the trial court was correct in instructing the jury to determine if the notes marketed by petitioners were securities.

■ Petitioners next allege that the evidence does not support a finding that the notes they marketed were securities. In determining whether an instrument is a security, substance and economic realities are more important than form. *E.g., SEC v. W.J. Howey Co.,* 328 U.S. 293, 298, 90 L. Ed. 1244, 66 S. Ct. 1100, 163 A.L.R. 1043 (1946). Therefore, neither the fact that the instruments marketed by Sea–Tac were notes, which are within the definition of security in RCW 21.20.005(12), nor the fact that Sea–Tac referred to the purchasers of those notes as "investors" is determinative of whether Sea–Tac marketed securities. "What distinguishes a security transaction . . . is an investment where one parts with his money in the hope of receiving profits from the efforts of others . . ." *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 858, 44 L. Ed. 2d 621, 95 S. Ct. 2051 (1975). Because the securities fraud acts are remedial and designed to protect the public from speculative or fraudulent schemes of promoters, we apply a broad definition to the term "security", as do the federal courts. *SEC v. Glenn W. Turner Enters.,* 474 F.2d 476, 480–81 (9th Cir. 1973).

The definition of security in RCW 21.20.005(12) includes any "investment contract". An investment contract for the purpose of this definition is (1) an investment of money, (2) in a common enterprise, (3) where the investor expects to reap profits from the efforts of the promoter or a third party. *McClellan*, at 531; *W.J. Howey Co.*, at 298. The *"Howey* test" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *W.J. Howey Co.*, 328 U.S. at 299.

Here, the investments marketed by Sea–Tac clearly meet the first prong of the *Howey* test. The promissory notes secured by deeds of trust were sold to members of the public as high interest investments. Sea–Tac's literature distributed to potential purchasers of the notes was addressed "To: Potential Investor," and after giving an example of the return on a note, urged them to "[c]ompare these figures with any other sound investment available." Exhibit 69. None of the investors testifying in this case was in the business of purchasing or selling notes secured by deeds of trust, and they each apparently viewed the transaction as an investment.

The second prong of the *Howey* test is the existence of a common enterprise. "[A] common enterprise need not be a common fund. The term denotes rather an interdependence of fortunes, a dependence by one party for his profit on the success of some other party in performing his part of the venture." *McClellan*, at 532. Petitioners argue that the investors were simply purchasers through Sea–Tac of promissory notes and were depending on the value of the notes themselves, and not on Sea–Tac for their profits. The State argues that the many services Sea–Tac offered its investors made them depend on the common enterprise of Sea–Tac, rather than merely on the value of the notes for their profits.

The sale of a distinct item, such as a secured promissory note or even a piece of real property, can under some cir-

cumstances be the sale of a security, even where the item sold appears to have extrinsic independent value. The crucial question is whether extra services are offered to purchasers that would tend to make them dependent on the seller or another for their profits, rather than the value of the item purchased. Thus, in *United States v. Farris,* 614 F.2d 634 (9th Cir. 1979) the court found that a scheme involving the marketing of notes secured by deeds of trust to constitute the offer and sale of securities. In *Farris* an investment company acquired either actual or paper interests in Arizona land, divided the land into lots, marketed these lots taking notes and deeds of trust from the purchasers, and then, in turn, sold those notes and deeds of trust to investors. If a lot purchaser defaulted the investor would have the option of foreclosure, a substitute note, or refund of the unpaid principal. The investment company agreed to make all collections from the purchasers and disbursements to the investors. The *Farris* court found significant the fact that the investors were unsophisticated, that the investment company agreed to collect and guarantee the notes, and that the investors placed substantial trust in the management skill and solvency of the investment company. *Farris,* at 641.

Similarly, here Sea–Tac sold notes to unsophisticated purchasers who depended on Sea–Tac to screen borrowers, and perform other important services. The fact that certain services, such as the guaranty and collection services, were not purchased in every instance is not dispositive; the crucial issue is that the services were offered along with the sale of the note. *See W.J. Howey Co.,* at 300–01 (sale of small parcels of citrus grove with an optional recommended contract for harvesting and marketing produce is a sale of securities where most purchasers had no experience in citrus cultivation). The passivity of investors and their dependence on the ongoing management of the seller of an investment contract also indicates a "common enterprise." *See United States v. Carman,* 577 F.2d 556 (9th Cir. 1978).

In *Los Angeles Trust Deed & Mortgage Exch. v. SEC,*

285 F.2d 162 (9th Cir. 1960) the defendants sold promissory notes secured by deeds of trust to thousands of investors on a promise of a 10 percent rate of return. The court found a "common enterprise" based on the various services promised by the defendants, including repurchase of any delinquent trust deed, checks of the trust deeds, collection services, keeping the title in defendant's name, and general supervision. The court found that under those circumstances the investors' profits were inextricably woven with the defendants' ability to provide those services and their ability to locate by the exercise of their independent judgment a sufficient number of discounted trust deeds. *Los Angeles Trust Deed & Mortgage Exch.*, at 172. *See also McClellan* (investors depended on defendant's selection, purchase, and resale of silver bullion). Similarly, here, the investors' profits were "inextricably woven" with Sea–Tac's screening and other services, and most importantly its ability to find sound business borrowers. It was Sea–Tac's failure to do so that caused their losses.

The testimony of petitioner Montgomery, to the effect that when Sea–Tac's continued viability as an enterprise came into question the borrowers began to default on their payments, was compelling evidence of a common enterprise:

> When we were forced out of business the credibility that we had was all gone. We were, as I said, all over the press. We were not allowed to advertise.
> And I don't believe that there is a borrower out there that didn't know of our situation. Many of them paid their loans; as a matter of fact, the majority of them did.
> . . . And I believe that it had a direct effect on those that did not pay.

Verbatim Report of Proceedings, at 128 (March 7, 1984) (Montgomery testimony).

Substantial evidence supports the jury's finding that Sea–Tac offered services on which investors depended to assure the viability of the investments, and thus there was a common enterprise.

The final prong of the *Howey* test is that the efforts of

Sea–Tac must have been the undeniably significant ones that affected the success or failure of the investments. In order to promote the remedial purpose of the Securities Act of Washington, we do not require that the profits come "solely" from the efforts of others, as the United States Supreme Court opinion in *SEC v. W.J. Howey Co.* appears to indicate. Rather, the test is whether the efforts of Sea–Tac were the undeniably significant ones that affected the success or failure of the enterprise. *McClellan,* at 532; *cf. Glenn W. Turner Enters.,* at 482.

Petitioners argue that it was the continuing willingness of the borrowers to make payments under their notes that determined the success of the investments. While that is true, it is equally true that Sea–Tac's screening borrowers and determining the value of their collateral, obtaining accurate information, and in some instances guaranteeing collection were also "undeniably significant". It was Sea–Tac's failure to meet those obligations, in particular its failure to assure that the loans were in fact for legitimate business purposes, that resulted in losses to investors. In each of the transactions leading to a conviction, Sea–Tac did not simply fail to ascertain the true purpose of the loan; it knew that the loan was for a nonbusiness purpose and was risky, but kept that information from the investor.

In sum, the promissory notes marketed by Sea–Tac meet the three prongs of the *Howey* test as adopted by *McClellan,* and are therefore securities under RCW 21.20.005(12).[1]

## JURY INSTRUCTIONS

The petitioners were convicted of various counts of securities fraud under RCW 21.20.010, which states:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indi-

---

[1]Because we find the notes fall under the definition of security as an investment contract, we do not reach the issue of whether they qualify as securities because they are notes under any of the three tests used by the federal circuits. *See Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 431 (9th Cir. 1978).

rectly:

(1) To employ any device, scheme, or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

The court instructed the jury using the exact language of the statute, and for each separate count of securities fraud substituted the name of the particular investor in place of "any person" in RCW 21.20.010(3).

■ Petitioners assign error to the court's failure to instruct the jury that (1) or (2) above required a specifically named victim. However, to so instruct the jury would be to alter the language of the statute under which the petitioners were charged. Only RCW 21.20.010(3) requires the fraud to be upon "any person". The United States Supreme Court, interpreting similar language of section 17(a) of the Securities Act of 1933, held that the first two sections need not have specific victims. *United States v. Naftalin*, 441 U.S. 768, 772–74, 60 L. Ed. 2d 624, 99 S. Ct. 2077 (1979). The trial court thus appropriately did not specify a victim of petitioners' behavior except under RCW 21.20.010(3).

■ Petitioners assert that the court's instructions that included the phrase "directly or indirectly" allowed the jury to convict on a conspiracy theory, although the prosecutor was not proceeding under a conspiracy theory. However, the instruction follows the exact language of RCW 21.20-.010, and the petitioners all had notice that they were charged under that statute. The court was correct in not altering the language of the statute under which petitioners were charged when it instructed the jury. *See State v. Crenshaw*, 98 Wn.2d 789, 805, 659 P.2d 488 (1983); *State v. Hardwick*, 74 Wn.2d 828, 830, 447 P.2d 80 (1968).

■ Petitioners assert that the instructions deprived them of their constitutional rights to a jury trial, as it was

not clear whether the jury was finding them guilty under subsection (1), (2) or (3) of RCW 21.20.010. However, the jury was instructed that it must be unanimous on the subsection under which it found the petitioners guilty. If substantial evidence supports the convictions under each of the alternatives, then the verdict will stand. *E.g., State v. Russell*, 101 Wn.2d 349, 678 P.2d 332 (1984); *State v. Franco*, 96 Wn.2d 816, 639 P.2d 1320 (1982); *State v. Arndt*, 87 Wn.2d 374, 553 P.2d 1328 (1976).

It is beyond dispute that substantial evidence supports the verdicts under RCW 21.20.010(1)–(2), which require no specific victim, as the petitioners were each employing a scheme to defraud investors by marketing usurious loans and omitted telling investors of the usurious nature of the loans. Petitioners challenge the jury's findings linking them to specific transactions involving specific investors, as required by RCW 21.20.010(3). In each of the transactions, the petitioner convicted was just one of the participants, and was often absent during some part of the transaction.

We do not here recount the evidence supporting each count, other than to note that the transactions generally followed a set pattern: (1) An individual desperate for a loan to forestall foreclosure or financial ruin would seek a personal loan from Sea–Tac, (2) Sea–Tac, with knowledge of the nonbusiness nature of the loan, would have the applicant sign documents indicating that the loan was for a business purpose in order to circumvent usury laws, (3) an investor, lured by Sea–Tac's advertisements for sound investments with 30 percent rate of return would visit Sea–Tac and discuss making an investment, (4) Sea–Tac would assist the investor to choose a loan to fund, but would not inform the investor that the loan selected was not for business purposes, that it was a high risk loan, that the borrower was being charged a loan fee of up to 50 percent, or that the loan was usurious under those circumstances, (5) Sea–Tac had the borrower make a note payable to the investor, and had the investor make payment to Sea–Tac, retaining a loan fee for itself before paying the borrower,

(6) the borrower in some cases ceased making loan payments after Sea–Tac collapsed, and in some cases sued the investor for usury.

Although we do not choose to recite the facts surrounding each count, which was aptly done by the Court of Appeals in the unpublished portion of its opinion, we will discuss those counts for which petitioners Thompson and Philips most urgently assert there was no substantial evidence supporting their convictions.

Thompson's sole alleged participation in count 5, which involved selling a promissory note to Gordon Young, was a phone call Young made to Sea–Tac to discuss investment opportunities. Young became aware of Sea–Tac through both television and newspaper advertisements, and was attracted by the promise of a 30 percent return on his investment. He called Sea–Tac and spoke with a man identifying himself as Gordon Thompson about this investment opportunity. Thompson assured Young that the 30 percent interest rate was not usurious because Sea–Tac made only business loans. Thompson promised to send Young investment literature. Young subsequently received a package of information from Sea–Tac, including literature describing trust deed transactions. Based on the representations made over the phone and in the literature, and other information provided by Sea–Tac employees, Young decided to fund a loan that was not, in fact, a business loan as represented, but a loan for a high–risk borrower who ultimately defaulted.

Thompson asserts that the only evidence linking him to this count is Young's testimony on the telephone conversation. To be admissible as evidence, telephone conversations must be authenticated. *State v. Deaver,* 6 Wn. App. 216, 218, 491 P.2d 1363 (1971). "[T]he identity of the person or persons holding the conversation, in order to fix a liability upon them or their principals, must in some manner be shown." *Deaver,* at 219 (quoting *Young v. Seattle Transfer Co.,* 33 Wash. 225, 230, 74 P. 375 (1903)). The identity of a party making a telephone call may be estab-

lished by circumstantial evidence. *State v. Elie,* 4 Wn. App. 352, 353, 481 P.2d 464 (1971). Thus, in *Deaver,* the fact that the caller identified himself as the person who had just left the hotel and gave the name he had used at the hotel was sufficient to take the evidence of the telephone call to the jury. *Deaver,* at 219. Here, the fact that Young called the Sea–Tac number where Thompson worked, combined with the fact that the voice answering identified himself as Thompson and engaged in a serious conversation about Sea–Tac's services is substantial evidence authenticating the telephone conversation. Substantial evidence supports Thompson's conviction on count 5.

Philips alleges that on the sole count for which she was convicted, count 16, she acted only as a notary to the borrower's signature on loan documents and that she was only a secretary/receptionist at Sea–Tac. The evidence is to the contrary. Philips, a licensed real estate salesperson, played an active role in the loan transactions, and met with borrowers to procure signatures on loan documents, and sometimes assured investors that the borrowers could make the payments. She was not merely a secretary/receptionist. She played an active role in the transaction leading to the charge in count 16, which involved the marketing of a promissory note to Shirley Larson.

When Yvonia Johnson received a postcard advertisement from Sea–Tac she needed $3,500 to prevent the imminent foreclosure of her home. After talking with two other Sea–Tac employees, Johnson met with Philips at Sea–Tac and told her of her desperate need for funds to forestall foreclosure. Verbatim Report of Proceedings vol. III, at 342–44 (March 2, 1984). Johnson returned to Sea–Tac and signed loan documents before Philips. One of the documents was a statement that the loan was for business purposes. Exhibit 95. Subsequently, Shirley Larson, attracted by the 30 percent rate of return offered by Sea–Tac, funded Johnson's loan, unaware that the loan was not for a business purpose, and thus carried an illegal interest rate. Larson was subsequently sued by Johnson for usury.

Viewing the evidence and inferences therefrom in a light most favorable to the prosecution, we find that it supports a finding beyond a reasonable doubt that Philips engaged in a practice that operated a fraud upon Larson. Although Philips may not have known which investor would ultimately fund Johnson's loan, she clearly knew that the purpose of the business purpose statement was to induce an investor to rely on its accuracy and part with his or her money. When the business purpose statement was signed in Philips' presence, she knew it to be false. She was thus a participant in one phase of a scheme that defrauded Larson. It is not necessary that the petitioner be present at every step of that "practice" or "course of business" to be guilty of securities fraud. *Farris,* at 638–39.

We have examined the entire record, and conclude that, on every count under which the petitioners were convicted, substantial evidence supports the finding that the petitioners were active participants in the illegal transaction and were guilty of securities fraud under RCW 21.20.010.

## SEVERANCE

Petitioners repeatedly moved the trial court to sever their trials: they allege that the evidence introduced against other petitioners had a spillover effect which acted to their detriment. The failure of the trial court to sever trials of defendants is reversible only upon a showing that the court's decision was a manifest abuse of discretion. *State v. Grisby,* 97 Wn.2d 493, 647 P.2d 6 (1982), *cert. denied sub nom. Frazier v. Washington,* 459 U.S. 1211 (1983). Separate trials are not favored in Washington, and defendants seeking severance have the burden of demonstrating that a joint trial would be so manifestly prejudicial as to outweigh the concern for judicial economy. *Grisby; see also United States v. John Doe,* 655 F.2d 920 (9th Cir. 1980). The mere fact that evidence admissible against one defendant would not be admissible against a codefendant if the latter were tried alone does not necessitate severance, *State v. Walker,* 24 Wn. App. 78, 599 P.2d 533 (1979), nor does the fact that

some defendants choose to testify in their defense while other codefendants invoke their Fifth Amendment rights. *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968), *cert. granted, vacated in part on other grounds and remanded,* 408 U.S. 934 (1972).

Here, the petitioners argue that because there were 16 counts, and some petitioners were charged on as few as 2 counts, the jury could not reasonably have compartmentalized the evidence as it related to each petitioner. *United States v. Farris,* 614 F.2d 634 (9th Cir. 1979). The State counters that the verdicts show that the jury in fact did compartmentalize the evidence. No petitioner was convicted on every count charged. Where more than one petitioner was charged in a count the jury regularly acquitted all or some of the charged petitioners. The jury by its verdicts demonstrated that it considered the evidence separately against each petitioner. Moreover, the court repeatedly instructed the jury that items of evidence related only to specific petitioners charged. We note that the offending evidence was not highly prejudicial; rather it was merely irrelevant as to certain petitioners.

We hold that the trial court did not abuse its discretion in denying petitioners' motions for separate trials.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Montgomery alleges in a personal restraint petition that his constitutional right to counsel was violated because of a conflict of interest with his attorney. Montgomery was represented at trial by Monte Hester, an attorney who had given Sea–Tac legal advice. Before trial, the prosecution stated that if petitioners brought up at trial advice that Hester had given Sea–Tac, the prosecution would call him as a witness. At trial Hester chose not to examine Montgomery about advice Hester had given Sea–Tac. The attorneys for the other petitioners similarly did not examine their clients about legal advice, or try to call Hester as a witness.

Montgomery alleges in a personal restraint petition and

in his petition for review that Hester's conflict of interest with Montgomery affected his performance at trial. *See Cuyler v. Sullivan*, 446 U.S. 335, 348, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980) (Sixth Amendment violated if conflict of interest adversely affects lawyer's performance). He asserts that calling Hester to testify would have evidenced his honest belief in the truth of the assertions he made to investors, and would have demonstrated that he was not reckless. He further asserts that the prosecutor and the trial court should have moved to disqualify Hester, or ascertain whether the conflict of interest would affect Montgomery's Sixth Amendment rights. *See United States v. Iorizzo*, 786 F.2d 52 (2d Cir. 1986); *In re Richardson*, 100 Wn.2d 669, 675 P.2d 209 (1983).

Unlike ordinary assertions of ineffective assistance of counsel, when a defendant can show that there was a conflict of interest adversely affecting counsel's performance, he need not show actual prejudice, or that the trial would have come out differently if there had been no conflict. *Walberg v. Israel*, 766 F.2d 1071, 1075 (7th Cir. 1985). The reason for this rule is that determining the effect of such a conflict on an attorney's performance would be virtually impossible. *Holloway v. Arkansas*, 435 U.S. 475, 490–91, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978).

The primary flaw in Montgomery's argument is his failure to show any conflict of interest between himself and Hester. The only possible conflict would have been Hester's desire not to testify, because he then would have been forced to stop representing Montgomery, and presumably lose his legal fees. *See* former CPR DR 5–102(A) (attorney must withdraw if he ought to be called as a witness). However, it does not appear that Hester had any relevant testimony to offer or that he "ought" to have been called as a witness. Knowledge that an instrument is a security is not an element of securities fraud under RCW 21.20.010. *See United States v. Brown*, 578 F.2d 1280 (9th Cir. 1978). Thus Hester's advice to Sea–Tac as to whether it was marketing securities was irrelevant to this case. Montgomery

does not allege that Hester advised him that the representations he made to individual investors were true, or even that Hester knew about those representations. Therefore Hester had no relevant testimonial knowledge. We note that none of the other three defense attorneys chose to examine Hester or the other attorneys that gave advice to Sea–Tac.

We reject Montgomery's argument that he had ineffective assistance of counsel and deny his personal restraint petition.

CONCLUSION

We find that the trial court made no error and that substantial evidence supports each of the convictions. We affirm the convictions on all the counts.

UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., and CUNNINGHAM, J. Pro Tem., concur.