IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MICHAEL MARIANI and PRESTIGE MANAGEMENT LLC, | No. 87072-6-I |
| Appellants, | DIVISION ONE |
| v. | |
| DEPARTMENT OF FINANCIAL INSTITUTIONS, | PUBLISHED OPINION |
| Respondent. | |

SMITH, J. — Gary and Irene Cline owned real estate in Washington which they had decided to sell. To increase the proceeds of the sale of that real estate and to defer taxes, the Clines invested in a deferred sales trust. Michael Mariani and Prestige Management, LLC, helped establish that trust and served as trustees for the account. Following review of the trust, the Department of Financial Institutions determined that the deferred sales trust and accompanying promissory note were securities not properly registered as such. The Department similarly determined that Mariani was not registered as a securities salesperson or broker-dealer. The Department ordered a fine as well as costs and fees. Mariani and Prestige petitioned for review of the order in superior court. The trial court affirmed the findings of the Department in their entirety. Mariani and Prestige appeal, asserting that the Department erred in determining that the deferred sales trust constitutes a security, that Mariani offered or sold a

security, and that no exemption for registration exists. Finding no error, we affirm.

FACTS

Deferred Sales Trust

A deferred sales trust (DST) is a tax-deferral concept created by Todd Campbell.[1] The concept relies on Section 453 of the Internal Revenue Code and a private letter ruling from the Internal Revenue Service. The letter ruling provides that income on an "installment sale" is not considered earned on an asset until the seller actually receives payment. By deferring the receipt of the purchase payment, the seller may defer paying taxes on any gain. This particularly appeals to owners whose property has dramatically appreciated in value since the original purchase. Without the use of a DST, the owners face substantial tax liability given the capital gains triggered by the sale of the property.

In a standard DST, the seller wants to sell an asset that has substantially appreciated in value but defer taxation on the gains from that sale. The structure used in a DST, including whether or not to utilize a promissory note, varies by transaction. The attorney for the seller is responsible for advising the client on how the specific DST is structured and drafting the necessary documents.

A DST involving a promissory note requires that the seller's attorney create a trust, which acquires the appreciated asset from the seller, and a

---

[1] The parties stipulated to the facts about the basics of a DST and the creation of the Lake Cavanaugh Trust.

promissory note from the trust in favor of the seller. The note obligates the trust to pay the seller the specified sales price, simply at a later time. The seller's attorney then works with the seller to determine when and how they would like to be repaid. Unless and until the seller actually receives payment from the trust, the seller need not pay any tax.

Once the appreciated property is transferred to the specifically-created trust, the trust often sells the property to a third-party buyer for cash. The third-party buyer may purchase the asset in a lump sum or in installments, the latter of which will fund the trust over time. Either way, the trust will invest the proceeds of the sale, seeking a return on the investment designed to: (1) meet its particular obligations under the promissory note to pay the seller the agreed upon sales price plus a set interest rate, and (2) build additional returns on the invested sale proceeds. The trust must retain the amounts earmarked for payment of the promissory note.

Lake Cavanaugh Trust

In 2013, Gary and Irene Cline decided to sell their vacation property (Lake Cavanaugh Property). The Lake Cavanaugh Property had substantially appreciated in value since the Clines bought the property in the 1970s. Originally purchased for $15,000, the Lake Cavanaugh Property was now worth over $200,000. Concerned with the amount of tax they would have to pay upon sale, the Clines learned about DSTs through their financial advisor. Their financial advisor referred them to Bob Binkele, who, in turn, referred them to Campbell. The Clines then retained Campbell as their attorney. In accordance with his

3

normal practice, Campbell prepared the documents necessary to create a trust (Lake Cavanaugh Trust) to acquire the Lake Cavanaugh Property.

In August 2013, Campbell procured Michael Mariani and Prestige, LLC,[2] an accountant and accounting firm respectively, to establish and act as trustee to the Lake Cavanaugh Trust. Campbell served as Prestige's attorney. After engaging Prestige, Campbell sent the Clines drafts of several documents necessary both to complete the sale of the Lake Cavanaugh Property and to transfer the assets to the trust. This included draft promissory notes. Campbell ultimately sent the Clines five different draft promissory notes over the following six months. Each defined the amount of the principle and provided that interest would accrue at a rate of eight percent. In addition to the multiple drafts, Campbell sent the Clines a variety of e-mails concerning the status of the promissory note. The Clines did not sign any of the draft promissory notes or provide a payment schedule.

Nevertheless, the Clines sold the Lake Cavanaugh Property to the Lake Cavanaugh Trust. In October 2013, Prestige sold the property to third-party buyers. The buyers provided a $50,000 down payment with an additional $188,000 to be paid in installments. The proceeds of that sale were deposited with the Lake Cavanaugh Trust as they were received. Mariani, as an individual, had no direct communication with the Clines until after the Lake Cavanaugh Property sold.

---

[2] As Mariani acted in his role as an accountant for Prestige, we refer to them collectively as "Prestige."

4

Once the proceeds from the property funded the trust, Prestige retained Binkele to provide the Lake Cavanaugh Trust with investment recommendations. As trustee, Prestige was required to preserve the trust's assets while also hoping to make more money than the promissory note required the trust to pay the Clines. Although the parties did not formally execute a promissory note, all acted as if one existed.

Administrative Review

In 2017, the Cline's insurance agent reviewed their holdings and expressed concern about the DST structure and lack of promissory note. In response, the Clines requested that Prestige liquidate the holdings of the Lake Cavanaugh Trust and distribute the proceeds. The Clines then brought a complaint to the Department. The Department opened an investigation in July 2017.

Following the Department's investigation, it issued a statement of charges concluding that the Lake Cavanaugh DST constituted the offer and/or sale of a security rather than a trust. The Department similarly concluded that Prestige sold unregistered securities, that Mariani offered and sold securities without registering as a securities broker, and that the operation of the trust constituted fraud. Mariani, Prestige, and Binkele appealed these charges.

The Washington State Office of Administrative Hearings held an administrative hearing in May 2022 to address the appeal. Following the hearing, the administrative law judge, acting as a reviewing hearing officer, issued an initial order, which affirmed the securities allegations but dismissed the

fraud allegation. Both parties petitioned for review of the initial order. The Department then issued a final order, again affirming that the DST arrangement with the Clines constituted an offer and sale of a security, that Prestige ordered and sold unregistered securities, and that Mariani offered and sold securities without being registered as a securities salesperson or broker-dealer. The Department also rejected Prestige's claims that the securities were exempt from registration. The Department ordered Prestige to pay a $20,000 fine, as well as costs, fees, and other expenses adding up to $15,000.

## Superior Court

Following the final order, Prestige petitioned for judicial review. The superior court affirmed the Department's final order. Prestige timely appealed to this court.

## ANALYSIS

### Standard of Review

Washington's Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of final agency action. RCW 34.05.510. Under the APA, we "look to the administrative record, not the superior court's findings or conclusions, when conducting judicial review of an agency decision." *Rios-Garcia v. Dep't of Soc. & Health Servs.*, 18 Wn. App. 2d 660, 667, 493 P.3d 143 (2021). We determine the validity of an agency's final order by applying the standards of review provided in RCW 34.05.570 to the agency action at the time it was taken. RCW 34.05.570(1)(b). We may reverse a final order only if the appellant establishes that the order is invalid because the order or statute upon

which the order is based is unconstitutional; the order is outside the authority of the agency; the agency has engaged in an unlawful procedure or decision-making process; the agency has erroneously interpreted or applied the law; the order is not supported by substantial evidence when viewed in the light of the whole record; the agency has not decided all issues requiring resolution; the order is inconsistent with another agency rule; or the order is arbitrary or capricious. RCW 34.05.570(3)(a)-(f), -(h)-(i).

Under RCW 34.05.570(3)(d), we may reverse an agency order if it is based on an error of law. We review such errors of law de novo. *Southwick, Inc. v. State*, 191 Wn.2d 689, 695, 426 P.3d 693 (2018); *Ames v. Dep't of Health, Med. Quality Health Assurance Comm'n*, 166 Wn.2d 255, 260, 208 P.3d 549 (2009). "However, we give substantial weight to an agency's interpretation of the law it administers, especially when the issue falls within the agency's expertise." *Southwick*, 191 Wn.2d at 696. Agency findings of fact not assigned error are verities on appeal. *Seven Hills, LLC v. Chelan County*, 198 Wn.2d 371, 384, 495 P.3d 778 (2021).

Security

Prestige asserts that the Department erred in finding that the DST mechanism at issue constitutes a security under RCW 21.20.005(17).

The Securities Act of Washington (Act), chapter 21.20 RCW, is primarily designed to protect investors from fraudulent and speculative schemes. *Helenius v. Chelius*, 131 Wn. App. 421, 432, 120 P.3d 954 (2005). Courts

7

construe the Act broadly to best effectuate this intent. *Helenius*, 131 Wn. App. at 432.

> The Act broadly defines a "security" as
>
> any note; stock, treasury stock; bond; debenture; evidence of indebtedness . . . preorganization certificate or subscription; transferable share; investment contract; investment of money . . . in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture.

RCW 21.20.005(17)(a).

The United States Supreme Court emphasizes the broad definition, declaring that the general definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Sec. & Exch. Comm'n v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946). Washington courts apply the test outlined in *Howey* to determine whether a transaction constitutes a security. *Cellular Engineering, Ltd. v. O'Neill*, 118 Wn.2d 16, 25-26, 820 P.2d 941 (1991).

*Howey* sets forth the elements needed to show the existence of a security as (1) an investment of money, (2) a common enterprise, and (3) an expectation of profits deriving primarily from the efforts of the promoter or a third party. 328 U.S. at 301; *Cellular*, 118 Wn.2d at 25-26.

The parties dispute the Department's application of the *Howey* test to the facts at issue. Because the DST is a common enterprise with an expectation of

profits resulting from third-party efforts, we conclude that the Department correctly determined it to be a security.

1. Existence of an Investment

Under *Howey*, the first element required is an investment of money. 328 U.S. at 301. Prestige concedes that this first element is met.

2. Common Enterprise

Prestige asserts, however, that the Department erred in finding that the Clines entered into a "common enterprise" with Prestige. Because the Clines were dependent on Binkele and Prestige for their profits, the investment venture constitutes a common enterprise.

The second element in the *Howey* test considers whether the investment venture is a common enterprise. 328 U.S. at 301; *McClellan v. Sundholm*, 89 Wn.2d 527, 532, 574 P.2d 371 (1978). Under Washington law, a common enterprise involves " 'dependence by one party for [their] profit on the success of some other party in performing [their] part of the venture.' " *State v. Philips*, 108 Wn.2d 627, 632, 741 P.2d 24 (1987) (quoting *McClellan*, 89 Wn.2d at 532). In *Howey*, for example, out-of-state investors contributed money to a large citrus fruit enterprise in Florida. 328 U.S. at 299-300. The investors purchased the tracts of land but did not farm the land themselves. Instead, the enterprise hired labor and made all the necessary management and fruit-growing decisions. *Howey*, 328 U.S. at 295-96. The Supreme Court determined that the relationship between the investors and the enterprise satisfied the common enterprise prong

because management by the service company was essential if the investors were to expect any return on their investment. *Howey*, 328 U.S. at 300.

Here, because the Clines were similarly dependent on Binkele to recommend the appropriate investments and on Prestige to make those investments if they were to expect any return, the facts satisfy the common enterprise prong.

As evidenced by the risk tolerance questionnaire Prestige provided the Clines, the Clines' investment knowledge fit somewhere between "limited" and "good." Binkele, in contrast, testified to his 30 years of experience in the securities industry. Binkele then used this knowledge and experience to recommend funds that met the Clines' investment objectives. The Clines followed his advice every time. Even Mariani, who spent his career in the financial industry, testified that he trusted and relied on Binkele's investment advice. Therefore, in Prestige's own terms, Binkele provided the expertise and knowledge considered by everyone involved. That alone displays that the Clines' profits were dependent on Binkele's efforts.

Prestige suggests that because the Clines were careful investors and shared no common goal with Prestige, they were not sufficiently dependent on Binkele or Prestige. We disagree.

First, although the record does display that the Clines were careful investors, being a careful investor does not undermine reliance on an expert with 30 years of experience. In fact, being a careful investor often means relying on someone else who knows more. Gary Cline's deposition provided a number of

10

examples of this reliance.  And, as noted, even Mariani testified to relying on Binkele.  Dependence is not negated simply by a party having a "limited to good" understanding of investing.

Additionally, under Washington law, an investor need not expect profits *solely* from the efforts of a promoter or third party.  *Philips*, 108 Wn.2d at 635.  "Rather, the test is whether the efforts of [the other] were the undeniably significant ones that affected the success or failure of the enterprise."  *Philips*, 108 Wn.2d at 635.  The Clines testified to following Binkele's recommendations at all times.  Therefore, Binkele's efforts were undeniably significant ones that affected the success or failure of the enterprise.

As to the question of a common goal, Prestige points to non-binding Ninth Circuit case law stating that a common enterprise requires a goal "common to the investor and the seller, promoter or some third party."[3]  This involves an "interdependence of fortunes" between a knowledgeable group and another that lacks that knowledge.  Prestige asserts that no such interdependence exists here because the Clines were only interested in tax-deferral, Prestige was only interested in asset growth, and the Clines did not invest directly in Prestige.  We again disagree.

The fact that the Clines did not invest directly in Prestige is irrelevant.  Both parties engaged in the trust.  The case law Prestige cites does not require any further connection.  Next, the Clines repeatedly noted that asset growth, rather than simply regular income, was a primary goal for the DST.  This is found

---

[3] *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989).

in their answers to the risk tolerance questionnaire, which indicated an interest in long-term growth, as well as Gary Clines' testimony that growth of the funds was one of two reasons for entering into the DST at all. Asset growth, Prestige concedes, is similarly Prestige's primary goal because the firm only makes money if the investments return more than the principle and the eight percent interest owed to the Clines. Sufficient overlap exists here establish a common goal.

Because the Clines were dependent on Binkele and Prestige for their profits, the Department did not err in concluding that the investment venture is a common enterprise.

### 3. Expectation of Profits

Prestige also asserts that the court erred in concluding that the Clines had an expectation of profits from the efforts of the trustee. The Department contends that the Clines understood and expected that the investment of the proceeds of the Lake Cavanaugh Property sale would result in long term growth of the assets. We agree with the Department.

The last element under the *Howey* test considers whether the investor expects that profits will be gained from the efforts of some other party. *McClellan*, 89 Wn.2d at 532. Again, the profits need not come solely from the efforts of others. *Philips*, 108 Wn.2d at 635. The test is whether the other's efforts were undeniably significant. *Philips*, 108 Wn.2d at 635. And "there is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the [*Howey*] test. . . . In both cases, the investing public is

attracted by representations of investment income." *Sec. & Exch. Comm'n v. Edwards*, 540 U.S. 389, 390, 124 S. Ct. 892, 157 L. Ed. 2d 813 (2004).

Here, Prestige and Mariani appointed Binkele to invest the funds for growth. In the stipulated findings of fact, the parties agree that if the trustee is able to generate more money from the trust assets than is necessary to pay the principle and the interest owed on the promissory note, the trustee retains the excess. This is the incentive to act as a trustee in the first place, as well as the incentive to invest well. The interest owed on the promissory note, however, is also profit for the Clines.

The draft versions of the promissory note, which the parties treat as final, promise the Clines an interest rate of up to eight percent per year. This is an eight percent profit on top of the principle owed. And that interest results from Binkele and Prestige's undeniably significant efforts in recommending appropriate investments and in making those investments. The more money in the trust, the more valuable the interest. The fact that the interest is a variable return is irrelevant for the purposes of the *Howey* test.

Also, the Clines demonstrated their expectation in profits from Prestige's efforts in requesting an early withdrawal to fund their trip to Europe. In requesting the early withdrawal, the Clines noted the $14,800 in interest the Lake Cavanaugh Trust had accumulated the previous two years. They clearly considered this accumulated interest to be their money, and sought access to it accordingly. If the Clines had had no expectation of profits from Prestige's investments, they would have looked to only the principal amount.

Prestige contends that the Clines did not have an expectation of profits derived from the efforts of a third party because the Clines primarily controlled the business venture and therefore could not have been a passive dependent participant. But we again disagree because the record demonstrates that the Clines retained no control over the trust.

The agreement and declaration of the trust provides that the trust gives the trustee complete authority to carry out the purpose of the trust. Therefore, as trustee, Prestige gained complete authority. The statement of additional disclosures then provides, "I understand that, following the transfer of assets into the trust, I will no longer own the assets and investment decisions regarding those assets will be a matter between the trust and the company they choose for services." This shifts all decisions concerning the trust to Prestige, Mariani, and Binkele. And lastly, Mariani explicitly explained the Clines' lack of control in an e-mail to Gary Cline, stating "[y]ou are apparently missing something very basic about this transaction that I have tried to explain over and over again. We cannot follow your instructions. . . . You cannot control the funds. You cannot instruct us on what to do."[4] This evidence undermines Prestige's argument that the Clines demonstrated control by signing off their approval on every transaction. Clearly, the Clines' approval did not actually affect the actions taken.

---

[4] At oral argument, the parties disagreed as to the timing and circumstance of this e-mail.

The Department did not err in determining that the eight percent interest on the promissory note constitutes an expectation of profits gained from the efforts of Binkele and Prestige.

4.  Promissory Note

Prestige then claims that the Department erred in relying on the existence of a promissory note in concluding that the DST met the definition of security under RCW 21.20.005(17).  Because the question of whether an investment venture constitutes a security requires consideration of the entire scheme, the Department did not err in considering the promissory note.

In determining whether an investment venture constitutes a security, the court looks to the entire investment scheme.  *Cellular*, 118 Wn.2d at 25.  "Thus, the issue is not whether the [a]greements are securities, but whether the scheme of which the [a]greements are a part constitutes the sale or offer for sale of securities."  *Cellular*, 118 Wn.2d at 25.

Prestige contends that the Department did not allege that the promissory note prepared for the Lake Cavanaugh Trust constituted a security.  Instead, the Department specifically charged that the transaction as a whole – which includes but is not limited to the promissory note – constitutes the security at issue.  This, Prestige asserts, confuses two different legal standards because determining whether a promissory note constitutes a security requires analysis under *Reves v. Ernst & Young*, 494 U.S. 56, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990), not *Howey*.  Prestige argues that without performing a *Reves* analysis, the

Department cannot rely on the existence of a promissory note in determining the application of the *Howey* factors.

But Prestige ignores both that the Department acknowledged but disregarded a *Reves* analysis and properly adopted the *Howey* test as enumerated in *State v. Saas*, 118 Wn.2d 37, 820 P.2d 505 (1991), to analyze the promissory note.

In its final order, the Department specifically noted that "while the *Reves* test does exist, the Washington State Supreme Court has previously allowed the *Howey* test to be applied to promissory notes." Under *Saas*, a promissory note can be characterized as a security where the note involves an investment of money in a common enterprise where the investor expects to gain profits from the efforts of a third party. 118 Wn.2d at 44. The Department followed that analysis and determined that the promissory note did constitute a security. Therefore, as a part of the overall scheme, the promissory note is relevant to the determination of whether the DST as a whole constitutes a security.

The Department appropriately considered the promissory note in determining whether the DST constituted a security.

<u>Offering or Sale of Security</u>

Prestige next contends that the Department erred in finding that Mariani offered or sold a security because no evidence exists that Mariani, as an individual, made an offer or sale of anything to the Clines. Because Campbell acted in his capacity as Prestige's attorney in offering the Clines the DST,

substantial evidence supports the finding that Prestige and Mariani offered a security.

Substantial evidence is evidence " 'sufficient to persuade a rational, fair-minded person that the finding is true.' " *Karanjah v. Dep't of Soc. & Health Servs.*, 199 Wn. App. 903, 916, 401 P.3d 381 (2017) (quoting *Cantu v. Dep't of Lab. & Indus.*, 168 Wn. App. 14, 21, 277 P.3d 685 (2012)). An " 'offer' or 'offer of sale' includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." RCW 21.20.005(14).

Prestige asserts that no evidence whatsoever exists to show that Mariani made an offer of sale of anything to the Clines. To the contrary, Prestige claims that substantial evidence shows that Mariani had no involvement with the Clines while they considered entering into a DST, instead only communicating after the fact. But this claim disregards that Mariani is a member of Prestige and that Prestige acted through Campbell.

Both parties stipulate that Campbell acted as Prestige's attorney. In addition, Campbell provided the Clines with a disclosure and wavier of conflict of interest, stating that "[t]he purpose of [the disclosure] is to: (1) make it clear that you are aware that I may be providing information and resources to you and/or your professional advisor(s) but that I will be representing Prestige in this transaction as I have represented them in similar transactions over the years." The disclosure continued on to discuss potential adversarial interests between the Clines and clients of "ours," referencing Campbell and Prestige as one entity. As one entity, any action Campbell took, he took on behalf of Prestige.

17

Indeed, Prestige was directly involved in marketing the DST to the Clines from the very beginning. Campbell provided the Clines with a PowerPoint presentation explaining the DST in July 2013. The PowerPoint was titled: "Deferred Sales Trust ("DST") Prestige Investment Management, LLC." In listing the "steps" that one can take to enter into a DST, the presentation began with "the ("Seller") can enter into an arrangement with Prestige Investment Management, LLC ("Prestige")." The presentation even included an image and biographical information about Mariani and indicated he was a principal of Prestige.[5]



In addition, Holly Mack-Kretzler, a financial legal examiner supervisor at the Department, testified that the sale of a security would involve the funding of the trust and completion of the paperwork, "[s]o people who are touching that completion of paperwork are going to be involved in the sale." Again, this court gives agency interpretation significant weight here, and the record displays ample evidence of Prestige's involvement with the completion of paperwork.

---

[5] We have redacted the images and listed locations to protect the individuals' privacy.

18

Given the extent of the evidence that Prestige and Mariani were involved in the original marketing efforts, the negotiation of the DST, and the execution of the documents, substantial evidence supports the finding that Prestige and Mariani offered and sold securities through Campbell.

Registration Exemption

Prestige asserts that the Department erred in determining no registration exemption exists because the DST is an isolated transaction and a sale not involving a public offering. We conclude that the Department did not err because the DST fails to satisfy the exemption requirements.

RCW 21.20.140 provides two exemptions from security registration: (1) the isolated transaction exemption and (2) the sale not involving a public offering exemption. The petitioners bear the burden of establishing that they are entitled to an exemption. RCW 21.20.540.

1. Isolated Transaction

Prestige claims that the DST is an isolated transaction and is therefore exempt from securities registration. We disagree.

Any isolated transaction is exempt from the registration and notification requirements under RCW 21.20.320(1). But, under WAC 460-44A-050(1)(d), to qualify for the isolated transaction exemption, a petitioner must establish that their sale of a security "is one of not more than three such transactions inside or outside this state during the prior twenty-four months."

Prestige contends that this DST is an isolated transaction because the Lake Cavanaugh DST could not have been offered or marketed to anyone other

than the Clines. If it is not an isolated transaction, Prestige continues, every IRA, 401(k), and other tax-deferral strategies would similarly constitute non-exempt securities. But whether this determination will impact a variety of other financial entities is not the applicable test. Rather, the question is simply whether Prestige can establish that this security is one of not more than three such transactions, across the country, in the last two years. Prestige cannot. Binkele testified as to dealing with hundreds of DST transactions. Campbell admitted his involvement in thousands. And Prestige does not provide any evidence that they have not offered a DST to less than three others in the past two years. Because Prestige carries the burden and fails to demonstrate that the DST is an isolated transaction, the Department did not err in determining the exemption does not apply.

    2. <u>Sale Not Involving a Public Offering</u>

Prestige also claims that the DST is exempt from registration as a sale not involving a public offer. We disagree.

Sales not involving a public offering are similarly exempt from the registration and notification requirements of RCW 21.20.320. This exemption is interpreted in a manner consistent with the corresponding exemption in federal securities law. WAC 460-44A-050(2). The issuer of the security has the burden to prove that the sale was a private offering. RCW 21.20.540; *Sec. & Exch. Comm'n. v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S. Ct. 981, 97 L. Ed. 1494 (1953).

20

Under federal securities law, "since exempt transactions are those as to which 'there is no practical need for . . . (the bill's) application,' the applicability of [the exemption] should turn on whether the particular class of persons affected need the protection of the Act." *Ralston*, 346 U.S. at 125. Therefore, "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering." *Ralston*, 346 U.S. at 125.

Here, the Clines have not been shown to be able to fend for themselves. Rather, the record repeatedly shows that the Clines did not have a strong understanding of how the DST works or of investment practices. First, the Clines never signed the promissory note requiring Prestige to return the principle. In fact, Mariani noted this vulnerability, informing the Clines that "negotiating the promissory note is in your best interest, not ours. As it stands, there's no written agreement that even shows an amount of money that is due to you." Although the parties all acted as though the promissory note was signed and effective, the Clines' failure to actually bind Prestige displays their lack of understanding.

Next, both Mariani's e-mail to the Clines and their attempt to withdraw funds for their Europe trip demonstrate that they were unaware just how much control they were releasing to Prestige. The Clines clearly thought of the money as their own, to withdraw and adjust as they saw fit. This again shows lack of understanding and inability to fend for themselves. Finally, the Clines' risk tolerance questionnaire, noting their limited understanding of investment practices, emphasizes their vulnerability. This DST is certainly not something they could have achieved on their own.

21

Because a transaction not involving a public offering is a transaction aimed at parties who are shown to be able to fend for themselves, the Department did not err in determining that this transaction does not fit within the exemption.

Offerees

Lastly, Prestige asserts that the Department erred in finding that the Clines were offerees and, in turn, construing RCW 21.20.005 as focusing "the inquiry . . . on the need of the offerees for the protections afforded by registration." We disagree.

Returning to its earlier argument, Prestige contends that the evidence does not support the conclusion that the Clines were offerees because no evidence supports the conclusion that Prestige or Mariani offered the Clines anything. But substantial evidence supports the conclusion that Prestige and Mariani offered the Clines the security through Campbell. This renders the Clines offerees. And because the Clines are offerees, they are afforded the protections of security registration.

We affirm.

_____
Smith, J.

WE CONCUR:

_____
Díaz, J.

_____
Colurn, J.